Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/31/2022 08:13 AM CDT

In re Interest of Gabriel B., a child
under 18 years of age.
State of Nebraska, appellee,
v. Al B., appellant.

\_\_\_\_ N.W.2d \_\_\_

Filed May 17, 2022.    No. A-21-542.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Juvenile Courts: Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another.
3. **Parental Rights: Proof.** For a juvenile court to terminate parental rights under Neb. Rev. Stat. § 43-292 (Reissue 2016), it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. The State must prove these facts by clear and convincing evidence.
4. **Parental Rights.** Past neglect, along with facts relating to current family circumstances—which go to best interests—are all properly considered in a parental rights termination case under Neb. Rev. Stat. § 43-292(2) (Reissue 2016).
5. \_\_\_\_. One need not have physical possession of a child to demonstrate the existence of neglect contemplated by Neb. Rev. Stat. § 43-292(2) (Reissue 2016).
6. \_\_\_\_. A parent neglects a child by failing to put himself or herself in a position where the child can be placed in the parent's care, in the same manner as a parent who improperly cares for a child in his or her care.
7. **Parental Rights: Proof.** Any one of the bases for termination of parental rights codified by Neb. Rev. Stat. § 43-292 (Reissue 2016) can serve as a basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.

- 22 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

8. ____: ____. In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child.

9. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit.

10. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit.

11. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being.

12. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries.

13. ____. While both the best interests analysis and the parental fitness analysis are separate inquiries, each examines essentially the same underlying facts.

14. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

15. **Parental Rights: Rules of Evidence: Due Process.** The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights.

16. **Parental Rights: Due Process.** The concept of due process embodies the notion of fundamental fairness and defies precise definition. In deciding due process requirements in a particular case, an appellate court must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the procedures used. Due process is flexible and calls for such procedural protections as the particular situation demands.

Appeal from the Separate Juvenile Court of Douglas County: Mary M.Z. Stevens, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Mary Rose Donahue for appellant.

Nathan Barnhill, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

Pirtle, Chief Judge, and Riedmann and Bishop, Judges.

Pirtle, Chief Judge.

## INTRODUCTION

Al B. appeals from the order of the Douglas County Separate Juvenile Court terminating his parental rights. He contends that the juvenile court erred in finding statutory grounds existed and that termination of his parental rights was in the minor child's best interests. He also takes issue with the court's determination that the case manager was an essential witness and not subject to the same sequestration as other witnesses. For the reasons that follow, we affirm the juvenile court's order terminating Al's parental rights.

## BACKGROUND

Al is the biological father of Gabriel B., who was born in May 2009. Gabriel began living with Al in March 2015 after his mother died by suicide. In March 2019, the State filed a petition alleging that Gabriel came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that Al was incarcerated at the time; had subjected Gabriel to inappropriate physical contact; had failed to provide proper parental care, support, and/or supervision; and had failed to provide safe, stable, and appropriate housing for Gabriel, placing him at risk for harm.

On the same day the petition was filed, the State filed, and the court granted, an ex parte motion for immediate custody of Gabriel, to exclude the home of Al. The Department of Health and Human Services took custody of Gabriel, and he was placed with his stepmother, Jessica A., and he has remained with her since being removed from his father's care. Al has

- 24 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

not been allowed any visitation or contact with Gabriel since his removal.

In May 2019, the court found that Gabriel was a child within the meaning of § 43-247(3)(a). Several case plans followed.

In May 2020, the State filed a motion for termination of parental rights against Al, alleging that Gabriel came within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (9) (Reissue 2016) and that termination was in Gabriel's best interests.

Trial on the motion for termination was held on multiple days between September 2020 and April 2021. On the first day of trial, Al requested that all witnesses be sequestered. The State requested that Laura Johnson, Al and Gabriel's case manager from October 2019 to November 2020, be deemed an essential witness and allowed to remain in the courtroom. After hearing argument from both parties, the court found that Johnson was an essential witness.

The first witness to testify for the State was Dr. Theodore DeLaet, a licensed psychologist. He conducted a forensic psychological evaluation and parenting risk assessment of Al in September 2019. He testified that Al was "superficially cooperative" with the assessment and that there was a constant theme of "defensiveness or underreporting" in his responses. DeLaet also testified that Al had a strong perception that he was the victim in this case in that "false allegations" had been made against him and that his ex-wife and Gabriel "were out to get him."

Based on his evaluation and all available information, DeLaet rated Al at a moderate risk to engage in future child maltreatment. He stated that his opinion was based on several risk elevation factors, including Al's relationship instability, his aggression, and abuse allegations. DeLaet diagnosed Al with major depressive disorder, requiring therapeutic attention and medication. He also stated that therapy needed to include stress management and anger management. He testified that the evidence supported, but he could not confirm, a diagnosis of attention deficit hyperactivity disorder. He testified that

- 25 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

the goal was to manage these issues, not cure them. He also noted that Al exhibited an absence of empathy toward Gabriel and that absence of empathy is typically not a symptom or manifestation of depression.

DeLaet also noted that Al claimed he was traumatized by the "false allegations" against him. Al told DeLaet that his therapist had diagnosed him with post-traumatic stress disorder (PTSD) as a result of his wrongful arrest for child abuse and the experience of being in jail. DeLaet did not believe that these experiences amounted to a clinical diagnosis of PTSD.

Following DeLaet's testimony, Al renewed his objection to allowing Johnson to be present in the courtroom as an essential witness. He argued that no evidence was offered during the State's request to deem Johnson an essential witness. The court determined, based on its interpretation of Neb. Rev. Stat. § 27-615 (Reissue 2016), that the State needed to "make a showing" that Johnson needed to hear the testimony of other witnesses in order to form her opinion regarding Gabriel's best interests. The State then called Johnson to testify as to why she was an essential witness.

Johnson testified that although she had an opinion regarding Gabriel's best interests, additional information could either change or reinforce her opinion. She testified that she did not know what questions would be asked of witnesses or what answers they would give and that it was possible her opinion could change based on testimony during the proceeding.

The court ultimately overruled Al's objection to allowing Johnson to remain in the courtroom, but only during the testimony of Laura Allis, Gabriel's therapist, and Rose Payne, Al's therapist. Al then made a motion to exclude Johnson as a witness because the State did not make the required showing prior to DeLaet's testimony and because Johnson had already heard DeLaet testify. The court overruled Al's motion to exclude Johnson as a witness, and trial on the motion for termination continued.

- 26 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

Jessie Serafica conducted a forensic interview with Gabriel on January 30, 2019. Gabriel was 9 years old at the time. Serafica testified that during the interview, Gabriel made allegations of physical abuse against Al. Following the interview, Serafica recommended therapy for Gabriel based on his disclosures. She testified that she had no concerns regarding Gabriel's statements and did not notice any "red flags" during the interview.

Allis, Gabriel's therapist, testified that she treated Gabriel from September 2020 to June 2021. At the first session, Gabriel informed Allis that his father had physically and verbally abused him. Gabriel disclosed that his father spanked him, hit him, choked him until he passed out, and held a gun to his head.

Allis diagnosed Gabriel with chronic PTSD. His symptoms included nightmares, aggressive behavior, avoidance tendencies, and avoidance of talking about the trauma. The source of Gabriel's trauma was the abuse by Al.

Allis testified that Gabriel did not like talking about abuse by his father and that when he did talk about it, he appeared defeated and scared. He would also speak very fast and would "crunch down." Gabriel told Allis he was uncomfortable discussing the abuse because he was afraid his father would find out he had made negative statements about him and repercussions would follow.

Gabriel described an incident where Al held a gun against Gabriel's head. Gabriel told Allis that his father became upset because he had shaken the family's pet rabbit. Gabriel said that his father pushed him to the ground and held a gun to his head, telling him that "this is how easy it was for your mom to blow her brains out." Al was referring to the fact that Gabriel's mother died by suicide by shooting herself. Gabriel told Allis that when his father had the gun against his head, he was scared and thought he was going to die.

Gabriel also told Allis that when he would do his homework and get something wrong, his father would hit him.

- 27 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

Allis testified that Gabriel also talked about having bruises on his body and telling his teachers and his friends that he was being hurt. He said that no one took any action, so he stopped telling anyone about the abuse. He also stated that he stopped telling anyone because he was worried his father would find out and it would just be worse for him at home.

Allis also testified that Gabriel told her Al verbally abused him. Gabriel said he would go to his room when his father would come home to avoid him because he felt like he could not do anything right. Gabriel also revealed that his father would regularly come into his room and "destroy" it and then make Gabriel clean it up. Allis noted that Gabriel was mirroring that behavior by "destroy[ing] his room" himself. She testified that mirroring of behavior is common for abuse victims. Gabriel also had issues with outbursts and aggressive behavior.

Allis testified that Gabriel experienced a regression in January 2021 because he was worried and scared about the possibility of having to come to court and see his father. He was also having behavioral problems at school during the same timeframe.

During therapy, Gabriel was unable to identify any positive memories he had with his father. He told Allis he never wanted to see his father again and that he would not feel safe in his father's care. He did not want supervised visitation or even visitation through videoconferencing or some other outlet. Allis testified that based on Gabriel's feelings about his father, it was unknown how long it would take before he would feel safe or comfortable in his father's care or custody.

Allis also testified about the negative effects of forcing a child to attend family therapy with a parent the child is afraid of. She testified that it can make things worse for the child and that the child could potentially hurt himself or others.

Jessica, Gabriel's foster parent and Al's ex-wife, also testified. Gabriel was placed with Jessica in March 2019 and has lived with her since. Prior to placement, Gabriel lived with

- 28 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

Jessica when she was married to Al. Gabriel came to live with them in March 2015 after Gabriel's mother died. Gabriel was 5 years old at the time.

Jessica testified that Al started verbally abusing Gabriel about a month after he came to live with them. She stated that the verbal abuse occurred two to three times per week and included Al's telling Gabriel he was "worthless" and a "piece of shit," as well as blaming Gabriel for his mother's death.

Jessica testified that she also observed Al physically abuse Gabriel once or twice per week. She stated that she noticed the abuse occurring more frequently in November 2015, after her and Al's daughter was born, and that it continued until Al moved out in November 2018. She testified that Al would push Gabriel down the hall, drag him by his shirt, kick him, punch him in the stomach, and choke him until he passed out and that once, Al held a gun to Gabriel's head. Jessica testified about a specific incident in April 2015 when Gabriel was 5 years old. During that incident, Gabriel was not saying the letters of the alphabet correctly, which caused Al to get mad and kick him in the stomach.

In regard to the gun incident, Jessica testified that Gabriel had shaken a pet rabbit and that when Al saw Jessica crying, he grabbed his gun, held it to Gabriel's head, and said he was going to kill him. He also told Gabriel that "he was never going to be anything because he was just going to grow up and be a murderer." Jessica testified that Al pressed the gun to Gabriel's head so hard that there was a ring left on his forehead from the barrel of the gun. When Jessica later asked Al why he put a gun to Gabriel's head, his justification was that Gabriel was going to be a murderer, he was not going to amount to anything, he should just get rid of him, and there was no reason for him to be there.

Jessica stated that Al also physically abused her and that most of the abuse occurred in front of Gabriel and her daughter.

Jessica testified that during the time Gabriel lived with her and Al, Al was barely involved in Gabriel's day-to-day care

- 29 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

beyond providing him a place to live, which he paid for primarily with Gabriel's Social Security money.

According to Jessica, at the time of trial Gabriel was struggling in school, but he was "really good" overall and was happy. She testified that there are times when his behavior escalates, such as when he does not get his way he will throw a fit, throw things, and break things. She also testified that when she talks to Gabriel about the prospect of seeing his father again, he gets upset and his behavior escalates.

Johnson, the case manager, testified about Al's progress with his rehabilitation plan, specifically that he had completed the services that had been ordered by the court. Al was ordered to complete anger management class, which he completed in February 2020. Johnson testified that despite completing the class, she had not seen any discernible change in his behavior toward her or in general. She stated Al struggles to remain in a calm state when they meet and frequently raises his voice when talking to her, as well as clenching and unclenching his fists, which she sees as a sign of anger. She also testified that when he feels like he is not in control, he finds different ways to assert control. Johnson had also seen him get angry with his girlfriend.

Johnson stated that Al was ordered in June 2019 to participate in individual therapy and had been participating, but she had a hard time getting information from his therapist. In October 2020, he indicated he had completed all of his therapy goals, but Johnson again testified that she did not see any changes in him in the year that she had known him. She stated that he continually talked about how this case had ruined his life, how Jessica was lying, and how he is the victim. She further testified that Al does not understand how his actions and this case have affected Gabriel.

Johnson testified that she made efforts to meet with Al every month and that after a year of services, nothing has changed. She stated that he continues to see himself as a victim. He had not taken responsibility for what he had put Gabriel through

- 30 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

and had no empathy for him. As a result, Johnson did not believe Al was capable of meeting Gabriel's needs if he could not acknowledge that Gabriel has needs and feelings and that he has negatively impacted Gabriel's life. Johnson testified that Al had made poor progress toward reunification and that based on her observations and interactions with Al, he had not shown any behavioral changes and had not internalized any of the therapeutic services he has received. In her opinion, the safety risks that were present in March 2019 were still present when she left the case in November 2020. She also testified that in her opinion termination of Al's parental rights was in Gabriel's best interests.

Johnson testified that she would meet with Gabriel at least once a month. She stated that Gabriel was terrified about having to live with his father again and even terrified about seeing him in any way. Johnson agreed with Allis' testimony that in January 2021, Gabriel was nervous about having to see his father in court and was acting out as a result.

Payne worked with Al as his individual therapist beginning in December 2019. Payne initially diagnosed Al with anxiety and later with PTSD. She testified that anger can be a product of anxiety and PTSD. She testified that Al made the decision to stop going to therapy in December 2020 and that he had met all of his treatment plan goals at that time. In April 2021, he voluntarily started therapy again because he felt like he still needed help.

In June 2021, the juvenile court entered an order terminating Al's parental rights on the basis that there was clear and convincing evidence that Gabriel was a minor child within the meaning of § 43-292(2), (6), and (9) and that termination of Al's parental rights was in Gabriel's best interests. Al appeals the order terminating his parental rights.

## ASSIGNMENTS OF ERROR

Al assigns that the juvenile court erred in (1) finding that the State proved by clear and convincing evidence that Gabriel

- 31 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

was a minor child within the meaning of § 43-292(2), (6), and (9); (2) finding that the State proved by clear and convincing evidence that termination was in Gabriel's best interests; and (3) allowing Johnson to remain present in the courtroom during the testimony of DeLaet.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## ANALYSIS

*Statutory Grounds.*

[3] Al first assigns that the juvenile court erred when it found that statutory grounds existed to terminate his parental rights pursuant to § 43-292(2), (6), and (9). For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

[4-6] Section 43-292(2) provides for termination of parental rights when "parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." Past neglect, along with facts relating to current family circumstances—which go to best interests—are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). One need not have physical possession of a child to demonstrate the existence of neglect

- 32 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

contemplated by § 43-292(2). *In re Interest of Joseph S. et al., supra.* A parent neglects a child by failing to put himself or herself in a position where the child can be placed in the parent's care, in the same manner as a parent who improperly cares for a child in his or her care. See *In re Interest of J.N.V.*, 224 Neb. 108, 395 N.W.2d 758 (1986).

Al argues that the State failed to prove by clear and convincing evidence that he substantially and continuously neglected Gabriel or failed to provide him with necessary parental care and protection because he was not given the opportunity to improve his relationship with Gabriel or improve his parenting skills. He states that even though he was participating in court-ordered services, he was never allowed to have contact with Gabriel or participate in family therapy with him.

While it is true that Al has never been allowed contact with Gabriel since he was removed in March 2019, the evidence supports the juvenile court's determination that Al neglected Gabriel within the meaning of § 43-292(2). Shortly after Gabriel came to live with Al after his mother died, Al began subjecting Gabriel to verbal and physical abuse. Gabriel was 5 years old at the time. The verbal abuse included Al telling Gabriel he was "worthless" and a "piece of shit," as well as blaming Gabriel for his mother's death. The physical abuse included Al's spanking, hitting, and kicking Gabriel, choking him until he passed out, and holding a gun to his head. The verbal and physical abuse started around April 2015 and continued until November 2018 when Al moved out.

The fact that Al has not had contact with Gabriel since he was removed from Al's home was a consequence of Al's own actions during the time Gabriel was in his care. The abuse Gabriel endured by his father has had a traumatic and lasting impact on Gabriel. He has been diagnosed with chronic PTSD as a result of the abuse. He has nightmares, and he exhibits outbursts and aggressive behavior. He also mirrors some of his father's behavior, such as "destroy[ing]" his bedroom. In therapy, he does not like to discuss his father or the abuse

- 33 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

and is fearful of his father's finding out about what he says. In his foster home, Gabriel gets upset and his behavior escalates when there is any talk about seeing his father. In January 2021, Gabriel regressed in the progress he had made due to the possibility of seeing his father in court. He has made it clear that he never wants to see his father again and would not feel safe in his care. Allis testified it was unknown how long it would take before Gabriel would feel safe or comfortable in his father's care. Allis testified about the negative effects of forcing a child to attend family therapy with a parent the child is afraid of. She testified that it can make things worse for the child and that the child could potentially hurt himself or others.

The evidence also showed that Al sees himself as a victim and failed to show empathy toward Gabriel regarding the pain and trauma the abuse has caused him. He does not understand how his actions have affected Gabriel. Further, DeLaet's assessment showed that Al presents a moderate risk of future child maltreatment. Johnson did not believe that Al exhibited any behavioral changes even after completing rehabilitative services. By failing to internalize the rehabilitative treatment, the same safety risks that led to Gabriel's removal are still present.

Based upon our de novo review, we conclude that there is clear and convincing evidence that Al substantially and continuously neglected Gabriel or failed to provide him with necessary parental care and protection as required by § 43-292(2).

[7] Any one of the bases for termination of parental rights codified by § 43-292 can serve as a basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Accordingly, we need not determine whether termination of Al's parental rights was proper pursuant to § 43-292(6) or (9).

- 34 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

*Best Interests and Unfitness.*

Al next assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that termination of his parental rights was in Gabriel's best interests.

[8-11] In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

[12-14] The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

We note that Al has participated in and completed court-ordered services in this case. While we commend Al for his effort, we conclude there is clear and convincing evidence that it is in Gabriel's best interests to terminate Al's parental rights. The case manager had not seen any change in Al's behavior despite his participation in services. She testified that he

- 35 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

struggled with controlling his anger, needs to feel in control, had a victim mentality, had no empathy for Gabriel, and had not processed how his actions and this case have negatively affected Gabriel. As a result, she did not believe he was capable of meeting Gabriel's needs. In her opinion, the safety risks that were present when Gabriel was removed from Al's care were still present. She testified that terminating Al's parental rights was in Gabriel's best interests.

Gabriel suffers from chronic PTSD as a result of the physical and verbal abuse by his father. He continues to be afraid of his father and does not want to ever see him again, let alone live with him. Gabriel regressed in therapy when he thought he might have to face his father in court. He also has no positive memories of his father, and there was no evidence of any beneficial relationship between them. There was evidence that forcing him to attend even family therapy with his father would negatively affect Gabriel. There is no way of knowing how long it would be, if ever, before Gabriel would be willing to have contact with his father and feel safe and comfortable with him.

Accordingly, we find there is clear and convincing evidence that it is in Gabriel's best interests to terminate Al's parental rights.

*Essential Witness.*

Al's final assignment of error is that the juvenile court erred in allowing Johnson to remain present in the courtroom as an essential witness during the testimony of DeLaet. Both parties rely on § 27-615, which sets forth the rule regarding sequestering witnesses:

> At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order on his own motion. This rule does not authorize exclusion of . . . (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

- 36 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

Al argues that the court failed to require the State to present evidence prior to DeLaet's testimony as to why Johnson was an essential witness. The State did not present such evidence until after DeLaet's testimony, and when it did, there was no testimony as to why DeLaet's testimony would aid Johnson in forming her best interests opinion. Further, Al argues that Johnson was not an essential witness because she had the opportunity to request information from DeLaet during the time she was case manager. In other words, she had another way to obtain information from DeLaet other than his testimony at trial.

[15,16] We note that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* The concept of due process embodies the notion of fundamental fairness and defies precise definition. In deciding due process requirements in a particular case, we must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the procedures used. Due process is flexible and calls for such procedural protections as the particular situation demands. See *In re Interest of Brian B. et al.*, 268 Neb. 870, 689 N.W.2d 184 (2004).

In relying on § 27-615 as a guidepost, we note that the statute does not require that the witness have no other way to obtain the information needed except to be present in the courtroom. Further, § 27-615 does not require a party to present evidence in order to show that a witness is essential, as Al contends. The statute only requires a party to show that a witness' presence is essential to the presentation of the party's case.

At the beginning of trial, the State requested that the court declare Johnson an essential witness. The court then asked the State to explain why Johnson was an essential witness. The State explained that Johnson would be relying on testimony

- 37 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF GABRIEL B.
Cite as 31 Neb. App. 21

from other witnesses to form her opinion on Gabriel's best interests and that it was important for her to hear the testimony so she could give a fully informed opinion. Al's counsel objected to the request. In response, the State further explained that Johnson was essential to the presentation of its case because the "overarching" determination of whether termination of parental rights is appropriate is whether or not it is in the best interests of the child and Johnson was going to provide that opinion to the court. The State argued it was important for Johnson to hear the testimony of other witnesses so she could make a fully informed opinion in order to present the best evidence to the court. The court determined that based on Johnson's position as the case manager and the best interests opinion she would be providing, she was allowed to remain in the courtroom as an essential witness.

Johnson was asked by the State to provide an opinion about whether or not termination of Al's parental rights to Gabriel was in his best interests, the ultimate issue before the court. A case worker relies on collateral information in forming an opinion about best interests. DeLaet's evaluation of Al and subsequent testimony was the type of information that could impact Johnson's best interests opinion. Further, the State made a showing prior to DeLaet's testimony as to why Johnson was an essential witness. Accordingly, we find that Al's due process rights were not violated by Johnson's remaining in the courtroom during DeLaet's testimony. Al's final assignment of error fails.

## CONCLUSION

Based upon our de novo review of the record, we find that there was sufficient evidence to support the termination of Al's parental rights. Accordingly, the order of termination is affirmed.

AFFIRMED.