IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MISTY L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MISTY L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MEISHA L., APPELLANT.

Filed February 4, 2025.    No. A-24-388.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Allison M. Witcofski, of Douglas, Kelly, Ostdiek, Snyder, Ossian and Vogl, P.C., for appellant.

No appearance for appellee.

MOORE, PIRTLE, and BISHOP, Judges.

MOORE, Judge.

## INTRODUCTION

Meisha L. appeals from an order of the county court for Scotts Bluff County, sitting as a juvenile court, which terminated her parental rights to her daughter, Misty L. Upon our de novo review of the record, we affirm the juvenile court's order.

## STATEMENT OF FACTS

Meisha and Steven S. are the parents of Misty (born in May 2023). Steven relinquished his parental rights to Misty during this case and is only referenced as needed for context.

Meisha and Steven's parental rights to three older children were terminated in prior juvenile court proceedings. See *In re Interest of Charlotte S. et al.*, No. A-20-220, 2021 WL 616325 (Neb. App. Feb. 8, 2021) (selected for posting to court website). The oldest two of those

- 1 -

children were removed from Misty and Steven's care in December 2017 after the oldest child was found wandering unsupervised 3 blocks from home in a soiled diaper. The child was not dressed appropriately for the cold outside temperature. The Nebraska Department of Health and Human Services (the Department) provided numerous services to the family over the course of that case, including intensive family reunification counseling, intensive family preservation, parenting classes, and other family support services. The two older children returned to their parents' care in December 2018, but they were removed again in September 2019. The third child, born in November, was removed shortly after birth due to the pending case involving the older two children. Despite the services they received, Meisha and Steven were never able to maintain a clean, safe, appropriate living environment for the children for more than a few weeks at a time. In addition to ongoing issues with the cleanliness of the family home, there were also issues with the children's cleanliness and concerns about the parents' mental health. The juvenile court entered an order terminating Meisha and Steven's parental rights to the three older children in March 2020, and this court affirmed on appeal. The present case was initiated in May 2023, following Misty's birth.

On May 16, 2023, the State filed a petition in the juvenile court, alleging that Misty was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged that Misty lacked safe, stable, and sanitary housing; that her parents had a lengthy history of Department involvement, including prior termination of parental rights; that her parents engaged in domestic violence, placing Misty at risk of harm and/or depriving her of necessary parental care; and that her parents were unable to or could not provide Misty with appropriate care due to mental illness or mental deficiency. Also on May 16, the State filed a motion for temporary custody and a supporting affidavit. The supporting affidavit detailed the Department's investigation of an intake received following Misty's birth. Concerns with the family home included holes in the walls, exposed electrical wire and insulation, piled trash, the sound of mice in the walls, the smell of urine, and the lack of utilities. The sheriff's office was in the process of condemning the residence. Other concerns included the power dynamic and potential domestic violence between Steven and Meisha, the family's prior history with the Department, and Meisha's mental health and cognitive functioning. The juvenile court granted the State's motion, ordering that Misty be taken into the Department's temporary custody for placement outside the family home. Following her removal, Misty was placed in the adoptive home of her older siblings, where she remained at the time of the termination trial in this case.

A first appearance and protective custody hearing was held on May 25, 2023. Meisha entered a denial of the State's allegations against her. The juvenile court appointed a guardian ad litem for Meisha, and it ordered a parental capacity evaluation of Meisha to be paid for by the Department.

An adjudication hearing was held on June 27, 2023. Meisha withdrew her denial and admitted to the allegations regarding Misty's lack of safe, stable, and sanitary housing, as well as the lengthy history of Department involvement. In exchange, the State agreed to withdraw the remaining allegations of the petition with respect to Meisha. The juvenile court then adjudicated Misty as a child within the meaning of § 43-247(3)(a). The court ordered the Department to prepare a case plan and court report and scheduled a dispositional hearing.

A dispositional hearing was held on August 1, 2023. The State offered a copy of the Department's case plan and court report dated July 25, 2023, which recommended a permanency goal of adoption. The Department also recommended, pursuant to Neb. Rev. Stat. § 43-283.01(4)(c) (Cum. Supp. 2024), that reasonable efforts to preserve and reunify the family were not required due to the prior involuntary termination of Meisha's parental rights to Misty's siblings. At the hearing, Meisha's attorney objected to changing the case plan goal to adoption. The juvenile court continued the hearing to allow the parties time to provide further argument and evidence on the issues of permanency and reasonable efforts.

A dispositional and evidentiary hearing (on the issues of reasonable efforts and Misty's best interests) was held on September 25, 2023. Following this hearing, the juvenile court found, pursuant to § 43-283.01(4)(c), that reasonable efforts were not required by the Department moving forward. The court also adopted the Department's court report "to include the goal of adoption."

On October 3, 2023, Meisha and Steven filed a joint motion for parental visitation. In the motion, the parents alleged that the Department was not allowing visitation. They noted that, at the previous hearing, the juvenile court had "encouraged [them] to continue working on their [c]ase [p]lans" and alleged, "[t]his is basically impossible if they can no longer have any visits with their child."

On November 28, 2023, the State filed a motion to terminate Meisha's parental rights, alleging statutory grounds for termination under Neb. Rev. Stat. § 43-292(2) and (5) (Reissue 2016) and that termination of Meisha's parental rights was in Misty's best interests.

A permanency hearing, as well as a hearing on the parents' motion for visitation and a first appearance hearing on the State's motion to terminate, was held before the juvenile court on November 28, 2013. The juvenile court received a copy of the Department's case plan and court report dated November 22. The court ordered the permanency goal be changed to adoption with a concurrent plan of reunification. The court granted the motion for visitation, ordering supervised visitation up to 20 hours per week for each parent "by a licensed provider," to be paid for by the parents "on their own," rather than being paid for by the Department.

A termination trial was held before the juvenile court on March 19, 2024. The court heard testimony from several Department caseworkers, a family support worker, the foster mother, and Meisha. The court also received several exhibits, including photographs of the family home at the time of removal and of Meisha's current residence, copies of the court files of the prior juvenile court cases, Meisha's certificate of completion for the Circle of Security parenting class in this case, and a character reference letter from a friend of Meisha's.

Caroline Teeple was the Department case manager for the cases involving Meisha's three older children from December 2017 until their adoption in 2021. She testified that the main concerns in those previous cases were lack of supervision and appropriate, safe, protective parenting, as well as the condition of the home. She described the condition of the family home when the oldest two children were removed, indicating that the pipes were frozen, parts of the ceiling were caving in, there was exposed subfloor with nails, and the home was "just generally . . . filthy." Services provided by the Department included family support to help with the condition of the home, and the Department helped set up parenting and psychological evaluations, medication management, and individual therapy. Meisha completed a parenting capacity evaluation, but she attended therapy sporadically. Teeple noted that transportation and having a

working vehicle was often an issue for Meisha, but the Department did provide gas vouchers. Meisha also participated in a women's trauma group and completed the Circle of Security parenting class.

Meisha and Steven moved to a different residence in August 2018, and the Department continued to provide services, including supervised parenting time and intensive family reunification services. The older two children were returned to the family home in December and the family "graduated" from the intensive services in March 2019. By April, however, Teeple and other service providers in the case noted concerns about both the condition of the home and the condition of the children, as well as Meisha and Steven's willingness to "take feedback and redirection about those things." On one visit, Teeple observed "stuff spilled all over the kitchen on the floor," including dried blood, dirty dishes, and an insect "infestation." Providers reported that the children were "dirty," appeared "unkempt" with dirty clothes, and that Meisha and Steven needed redirection to "change clothes and change diapers and things like that." Teeple expressed concern about how quickly the condition of the home had deteriorated. The Department provided additional intensive family preservation services, and the condition of the home improved while that service was in place. However, once that service ended, the condition of the home again quickly deteriorated, and the oldest two children were removed again in September 2019.

Meisha became pregnant with her third child during the previous case. She obtained prenatal care only for the last few weeks of that pregnancy after presenting at the emergency room in November 2019 (she did not realize she was expecting a baby at that time). The third child was born a few weeks later. A motion to terminate Meisha's parental rights to her oldest two children was filed in December 2019 and a motion to terminate her parental rights to the third child was filed in February 2020. At the time those motions were filed, the Department's concerns included the fact that the oldest two children had been removed from Meisha's care twice and the lack of sustainable behavioral change by Meisha. Teeple testified that Meisha and Steven were able to maintain a clean home for short periods of a couple of weeks at a time. Teeple also noted that Steven was "not particularly kind" to Meisha and his belief that keeping the house clean was her role and that she was "entirely to blame" for the deterioration.

Tessa Fulk, an initial assessment worker with the Department, testified about the circumstances that led to Misty's removal from Meisha's care. She investigated the intake received on the day of Misty's birth, which alleged concerns with the family's history with the Department, as well as Meisha's ability to parent a newborn "due to her cognitive capacity." Fulk spoke with Meisha, who reported that the current family home had a hole in the roof that would take 2-4 weeks to repair. Meisha also reported her plan to stay with her mother during that time and that she had baby supplies she could pick up from the family home and take with her to her mother's residence upon her discharge from the hospital. Fulk discussed concerns about Meisha's mental health, and Meisha reported her diagnoses of "manic, bipolar depression and . . . anxiety." Meisha also told Fulk that she was taking prescription medication but was not in counseling. Meisha had had four or five prenatal appointments at the hospital prior to Misty's birth.

Fulk spoke with Meisha's mother and completed a walkthrough of her residence on May 14, 2023, which was "clean." Meisha's mother had only recently found out about Meisha's pregnancy and had not been expecting Meisha and Misty to move in with her. Later that same day, Meisha's mother contacted Fulk and reported an incident in which Steven killed multiple dogs,

including Meisha's "emotional support animal." She expressed concern about "power-control dynamics" and that there was emotional abuse occurring in Steven and Meisha's relationship.

Fulk and another coworker completed a walkthrough of the family home on May 15, 2023. Fulk observed holes in the floor and ceiling, exposed electrical wire and insulation in the walls, and "trash was piled above [her] ankle." She heard what sounded like mice in the walls, and the home smelled like urine. Upon completing the walkthrough, she was informed that the sheriff's office was condemning the home, so it did not have any power. Fulk testified that the physical living condition of the home was "endangering or hazardous" to a newborn child and described it as "by far the worst" she had ever seen. Fulk also expressed concern because Meisha's baby supplies were in a truck parked outside of the residence. Fulk observed that the supplies had been "left outside uncovered" and were "just dirty." Meisha was present for this walkthrough and expressed embarrassment about the home's condition. Meisha moved to her mother's residence after her discharge from the hospital, so she never lived with Misty in the prior family home.

Katelyn Templeton became the ongoing Department caseworker in mid-January 2024, after the determination by the juvenile court that the Department no longer had to provide reasonable efforts. Monthly family team meetings were still occurring, and Templeton was making efforts to speak to Meisha's medication management doctor. Templeton provided Meisha with a community support resource list for food pantries and housing, as well as the number for "community supports through Cirrus House if she ever fell on hard times . . . when the department wasn't around." Templeton testified that the family team meetings had been "[p]ositive for the most part." At the meetings, they discussed any worries or concerns Meisha might have, and Templeton kept her informed about court dates.

Templeton testified about issues relating to Meisha's medication management and mental health care. Templeton noted that Meisha takes Clonidine, as needed, for anxiety and Abilify for depression or "bipolar depression." Meisha missed a medication management appointment in December 2023 and did not see the doctor for medication management until February 2024. The doctor reported to Templeton that Meisha would have been out of her medications (or at least the Abilify) in December. Meisha reached out once to the doctor to make an appointment. Templeton also noted that Meisha had previously completed a parenting capacity evaluation, which recommended therapy, but that Meisha had never followed up on that recommendation. Meisha had just started seeing a therapist at the time of the termination trial.

Templeton testified to ongoing concerns with respect to the "power and control Steven continued to have over Meisha," even though they were not "together" and were "in the process of getting a divorce." Templeton noted that Steven had offered to pay for Meisha's visitation, that Meisha continued to take him to some doctor's appointments and transport him, and generally continued to "have him in her life." She expressed her understanding that the relationship was "violent," that it was "very much a power and control struggle between them," and that Meisha was "very much in the domestic abuse cycle." She testified that if Meisha wanted to reunify with Misty, she needed to prove that she could keep herself and Misty safe by not having Steven around.

At the time of the termination trial, Meisha had been living in her own apartment since November 1, 2023. The Department's first walkthrough of that apartment was completed on November 22. At that time, the apartment was "relatively clean," but Templeton noted a "musty smell" and the smell of "body odor." Templeton noted food in the refrigerator and pantry, and

there were working utilities. Meisha had a changing table, a "Pack 'n Play," and a "bouncer." These items were clean and have remained so during subsequent home visits. Templeton also noted dead bugs on the floor under a window. She testified that it looked like the apartment may have just been "sprayed for bugs" but that the dead bugs had not yet been cleaned up. Templeton also conducted home visits in December, January, February, and March. The apartment was generally clean, with food and utilities available, but on several of those visits, Templeton again noticed a few dead bugs on the floor under the window. And, on one occasion there were a few pieces of trash on the floor. Templeton agreed that the bugs and trash were "pretty minimal" and not enough to cause her to not be able to walk through the apartment. She also agreed that the apartment was "safe" during her visits and that it was big enough for Misty to stay there with Meisha, if allowed, at some point in the future.

After the Department was no longer required to provide reasonable efforts, Meisha was still approved for 20 hours of supervised visitation per week; the cost for supervised visits was approximately $200 for travel and $60 per hour. During Templeton's home visits, Meisha reported "every time" that she was not able to afford visitation with Misty on her current income. Meisha had reached out to her mother "for some help," but her mother was not able to afford the cost either. There had been references in family team meetings to Steven possibly lending Meisha money for visitation. Meisha also reported that she was "saving up money" to see her daughter. Meisha wanted to use the same provider who previously supervised her visitation.

Templeton had not discussed a support network with Meisha, but she was aware that Meisha had support from her mother as well as individuals from her work. Meisha has been employed at a fast-food restaurant throughout this case. At the time of the termination trial, she was in the process of trying to become a manager at the restaurant. Templeton agreed that Meisha had completed the Circle of Security class and a parenting capacity evaluation during this case. And, at the time of trial, she was participating in a women's trauma group.

Templeton testified that the Department supported termination of Meisha's parental rights based on her history of prior termination and concerns about her long-term ability to maintain a safe home. Templeton noted that there have been months when Meisha had to prioritize paying for her apartment, and times when she did was unable to pay for her phone. Templeton testified, "You throw, unfortunately, a baby on top of that when Meisha is already struggling to pay bills, it's a valid concern."

Cory Richa, a family support worker, supervised visits between Meisha and Misty between May and September 2023. She confirmed that Meisha had been unable to pay for supervised visitation once the Department was no longer required to provide reasonable efforts. Richa calculated that supervised visits would cost $200 an hour. When Richa was providing supervision, Meisha received about 21 hours of visitation per week. She transported Meisha and Misty, separately, for each visit. Richa described Meisha's visits with Misty as appropriate overall. She testified that Meisha "kept her full attention on her child," "tried to anticipate her needs," and "would be actively engaged with her." On one occasion, Meisha accidentally forgot a bottle, and she "made it her first priority to go purchase and clean a bottle."

Meisha followed a routine for Misty during the visits, feeding her if she appeared hungry and frequently engaging in appropriate play time. Meisha always prepared Misty's food herself during visits. At one point, Meisha added a small amount of rice to the formula, which had been

suggested by an Early Development Network (EDN) worker. Richa noted that the foster parent was upset when this occurred. Meisha regularly checked and changed Misty's diaper as necessary and would soothe Misty if she started crying. When Misty appeared sleepy during visits, Meisha would help "soothe her to sleep." Meisha stayed quiet while Misty was sleeping and always kept an eye on Misty to make sure she was okay. Meisha purchased items for visits including "a tummy time mat" and a "playpen crib." According to Richa, Meisha was "ready and on time" and prepared for each visit. Richa testified that Meisha was "[p]leasant, cheerful, ready to be engaged with her . . . child." She indicated that Meisha and Misty appeared to be comfortable and to enjoy interacting with one another. Richa only had to redirect Meisha on one occasion when Steven was repeatedly texting Meisha; Richa let Meisha know that she should not allow Steven to interfere during visits, and Meisha stopped the interaction with him. Richa also noted another occasion when she and Meisha took Misty to the hospital. Misty was crying and had "red blotches" on her body. At the hospital, the blotches disappeared. Richa testified that it had been "really hot outside" that day, and that the hospital staff felt Misty's reaction was probably due to the high outdoor temperature.

Meisha testified about her current employment and apartment. She confirmed that she has lived alone in her apartment since November 1, 2023. She pays the rent; the landlord pays the utilities. She confirmed that there is enough room in the apartment for Misty and that she has supplies for her if Misty were allowed to live there. Meisha is a crew member at a fast-food restaurant where she has been employed for 2 years. She was working full-time at the time of the termination trial. She confirmed that she had recently taken steps toward getting a manager position at the restaurant.

Meisha testified that she and Steven were currently separated and that she had no interest in being in a relationship with him in the future. Meisha did not have the money to pay "for the divorce papers" but that she was working to get the money to file for a divorce from Steven. She expressed her intent, "if finances were to allow or services were made available to her," to pursue a divorce. According to Meisha, she had "limited contact" with Steven. She noted that Steven had been in a relationship with someone else for over a year and now lives in Wyoming. Meisha testified that she and Steven "officially" ended their relationship in September 2023. She had last seen Steven in person about 2 months prior to the termination trial. At that time, she saw him in Morrill, Nebraska, and played video games with him and his girlfriend to "say goodbye."

Meisha had not seen Misty since September 2023 when the Department ended reasonable efforts. She testified about her efforts to see Misty since that time, indicating that she had "talked to many people to try to get the money together" and that she had tried to save the money herself which was "not easy" on her salary. During the time Meisha had visits with Misty, she felt the visits "went pretty well." She testified that she was "very happy" to see Misty and to be with her. Her testimony about her preparation for and conduct during those visits was consistent with Richa's testimony.

Meisha testified about other services provided to her or recommended by the Department during this case. Meisha had a referral to EDN in this case to help "get the baby started on her early education." Meisha worked with an EDN worker to create and meet various goals in this case. Some of the goals included "keeping the privacy" for Misty, the foster family, and "the kids," to remove unnecessary stress, and "keeping an eye on [Misty's] development to see if she was in need of [EDN's] services for more than six months." She contacted the "WIC" program upon the

recommendation of an EDN worker but was not able to participate in that program. She did participate in the Scottsbluff diaper bank assistance program, which provides diapers to low-income families. She has also been in contact with DOVES, a program for women in abusive relationships, and DOVES helped her contact an attorney who "gave [her] the steps that [she] needed to take in order to start the divorce." One of the Department caseworkers suggested working with "the local housing authority" to find an apartment; Meisha found a landlord "who was more willing to work with her" through other contacts she made on social media.

Meisha testified about her mental health, confirming that she has been attending individual therapy. She likes her therapist and has set goals to work on during their sessions, including finding the triggers for her depression and how to best cope with those triggers, grief counseling for the death of a child she and Steven lost shortly after its birth, as well as for the recent death of her aunt. Meisha stated that she has been diagnosed with "Bipolar II" and that she has been taking medication for that condition since September 2023, "just after visitations stopped." She was asked about the lapse in her medication refills at the end of 2023. Meisha testified that her medications are refilled in 3-month increments. She indicated that she missed a medication management appointment in December and was out of a medication for a week and a half because that was "the soonest they could get [her] in" for another appointment. She testified that her medication helps her to be "much more focused" and that she does not "feel all over the place with [her] emotions." She believes the medications are helpful and intends to continue using them after the closure of this case, regardless of whether she is reunified with Misty.

Meisha asked that her parental rights to Misty remain intact. She wanted a chance to prove that she had changed and that she would continue to do so. She testified that she has changed since the previous juvenile court cases. She testified that she currently has a strong support group through her workplace. She also has support from a friend in the United Kingdom she met through online gaming, although she has never met this individual in person. Meisha testified that she has "finally realized what it's like to have a clean stable home," and that she has also realized her mental health was a problem but that it can be managed through therapy and medication.

On May 8, 2024, the juvenile court entered an order terminating Meisha's parental rights. The court found clear and convincing evidence for termination under § 43-292(2) and that termination of Meisha's parental rights was in Misty's best interests. However, the court found that the State had failed to offer sufficient evidence of grounds for termination under § 43-292(5). Meisha subsequently perfected her appeal to this court.

## ASSIGNMENTS OF ERROR

Consolidated and restated, Meisha asserts that the juvenile court erred in (1) finding clear and convincing evidence of statutory grounds to terminate her parental rights pursuant to § 42-292 and (2) finding that termination of her parental rights was in Misty's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). However, when the evidence is in conflict, an appellate court may consider and give

weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## ANALYSIS

*Statutory Grounds for Termination.*

Meisha first assigns that the juvenile court erred in finding clear and convincing evidence of statutory grounds to terminate her parental rights pursuant to § 42-292. Although the State sought termination under § 43-292(2) and (5), the court only found sufficient evidence for termination under § 43-292(2). For a juvenile court to terminate parental rights under Neb. Rev. Stat. § 43-292 (Reissue 2016), it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). The State must prove these facts by clear and convincing evidence. *Id.*

Section 43-292(2) provides for termination of parental rights when "parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." Past neglect, along with facts relating to current family circumstances—which go to best interests—are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Gabriel B., supra.* One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Gabriel B., supra.* A parent neglects a child by failing to put himself or herself in a position where the child can be placed in the parent's care, in the same manner as a parent who improperly cares for a child in his or her care. *Id.*

In considering the statutory grounds alleged for termination in this case, the juvenile court acknowledged that Meisha made certain improvements in her life and "some progress" in comparison to the circumstances of the prior court cases. The court noted that Meisha had "purportedly" ended her relationship with Steven, although no evidence of divorce proceedings was offered. The court also noted that Meisha had maintained employment and had her own apartment, which she kept "relatively clean" except for the dead insects and minor amount of trash noted by the caseworker. Meisha has maintained medication management, except for a brief period, has received some therapy, and has acknowledged the inappropriate uncleanliness of her former residence. Meisha has completed the Circle of Security parenting class again and is enrolled in a women's trauma group. During the visits she had with Misty, she was appropriately attentive and took redirection from the support worker when told not to engage with Steven on the phone during visits. Meisha has a support system through her work and through a friend from her online gaming.

Despite the improvements in Meisha's life, the juvenile court found grounds for termination under § 43-292(2). The court first noted that the termination of Meisha's parental rights to the older siblings was sufficient to satisfy § 43-292(2) as it relates to Misty, citing *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). The court noted that despite a substantial number of services implemented for the family during those prior cases, there remained an overwhelming concern regarding the inability to maintain sanitary living conditions and appropriately care for the minor children.

In this case, the juvenile court noted that during her pregnancy with Misty, Meisha did not seek or receive consistent prenatal care. The court observed that Meisha and Steven "were again living in squalor," noting that their residence was condemned shortly after Misty was removed from their care. The court noted that the baby items Meisha intended to use upon Misty's birth had been left outside in a vehicle, exposed to the elements for an indeterminate period. The court concluded, "Overall, these facts show a disturbing lack of insight, ability, or motivation to address the underlying issues and make progress toward changing her behavior," despite the previous termination of parental rights under similar circumstances. The court noted that Meisha had not been able to independently coordinate supervised visitation with Misty in the absence of reasonable efforts from the Department. The court found that Meisha had failed to demonstrate "the necessary wherewithal to maintain all of the requisite facets of parenthood at the same time," including spending time with her child, which never progressed beyond supervised visitation. The court concluded that the totality of the evidence, including "the indeterminate and speculative nature of the prospect for lasting improvement," dictated that the court find clear and convincing evidence for termination under § 43-292(2).

Our de novo review of the record is consistent with that of the juvenile court. Despite the improvements Meisha has made in her life, she has not put herself in a position to take placement of Misty or to provide parental care for her. Meisha has not clearly severed her ties with Steven. Although she has acknowledged the benefits of therapy and medication management for her mental health, she has not shown sustained progress in that area of her life. Misty was removed from Meisha's care shortly after her birth and has never resided in any home with Meisha. Meisha has not been able to put herself in a position to provide proper care for Misty. Meisha's history with her previous children reveals her inability to sustain stability and there exists a justifiable concern that she will be unable to sustain stability and provide proper care to Misty should Misty be placed with her. The juvenile court did not err in finding clear and convincing evidence of grounds for termination under § 43-292(2).

Because the State presented clear and convincing evidence that Meisha substantially and continuously or repeatedly neglected to give Misty necessary parental care and protection, statutory grounds for termination of Meisha's parental rights exists.

*Best Interests and Unfitness.*

Meisha assigns that the juvenile court erred in finding that termination of her parental rights was in Misty's best interests. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

In finding that termination of Meisha's parental rights was in Misty's best interests, the juvenile court stated:

> [T]aking into consideration the totality of the evidence from the [termination] hearing, including an assessment of the child's present circumstances and adjustments, including the fact that the child is flourishing alongside her siblings in foster care, as well as the child's long-term physical, social, and emotional needs, this court finds that sufficient evidence was presented to demonstrate clearly and convincingly that termination of parental rights is appropriate and in the best interests of the child. The totality of the evidence, including the mother's individual failures to provide for this child and accomplish meaningful and sustained improvement in parenting skills demonstrate parental unfitness and collectively dictate in favor of termination of parental rights being in the child's best interests. This child should not be made to wait uncertain parental maturity when there is clear and convincing evidence that the child's overall future well-being stands to improve with the prospects of new relationships which the termination might open for her.

We agree that termination of Meisha's parental rights is in Misty's best interests. Clearly, Meisha cares for Misty and has made some improvements in her life. She was attentive and caring during the visits she did have with Misty, but she has not placed herself in a position to demonstrate her parenting skills outside of the supervised visitation context. The removal of reasonable efforts by the Department was a statutory consequence of the prior termination of Meisha's parental rights to her older children. Although Meisha has maintained employment throughout this case and is pursuing prospects for advancement in that employment, those prospects are by no means certain. Meisha's low income has clearly limited her ability to achieve supervised visits with Misty in the time since the Department's reasonable efforts ended and she has not yet saved enough money for a divorce from Steven. Despite her professed desire to have no further relationship with him, the record shows that Steven did continue to regularly text Meisha and she played video games with Steven and his girlfriend at some point after the declared formal end of their relationship. Meisha's apartment was generally clean when viewed by her caseworker, but she had only been living there a little over 4 months at the time of the termination trial. She had only just started therapy and her ability to maintain medication management over a longer period is unclear. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L, supra*. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Misty has been in foster care since shortly after her birth in May 2023. She deserves stability in her life and should not be suspended in foster care when Meisha is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Meisha was unfit and that terminating her parental rights was in Misty's best interests.

- 11 -

## CONCLUSION

The juvenile court properly found that evidence existed to support termination of Meisha's parental rights to Misty under § 43-292(2) and that termination of her parental rights was in Misty's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.