IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DARRYL S. & DIMYA S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DARRYL S., JR., & DIMYA S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DARRYL S., SR., APPELLANT.

Filed February 25, 2025.    No. A-24-451.

Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

Kyle J. Flentje, of Flentje Law, L.L.C., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Haley L. Huson for appellee.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Darryl S., Sr. (Darryl Sr.), appeals from an order of the separate juvenile court for Lancaster County, terminating his parental rights to two of his children. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

Darryl Sr. is the biological father of Darryl S., Jr. (Darryl Jr.), born in April 2014, and Dimya S., born in April 2016. The children's mother is not a part of the appeal before us now and will not be discussed further.

- 1 -

## 1. Procedural Background

Darryl Jr. and Dimya resided in a home shared by Darryl Sr., Darryl Sr.'s former girlfriend and her four children (unrelated to Darryl Sr.), and the biological child of Darryl Sr. and his girlfriend. Darryl Jr. and Dimya were removed from the home by law enforcement on September 19, 2021, following a report that Darryl Sr. locked his girlfriend's four children in the basement of their shared home; assaulted the 13-year-old son of his girlfriend; and left the premises resulting in Darryl Jr. and Dimya, who were home but not locked in the basement, being left without a caregiver. The 13-year-old child victim and his siblings reported that Darryl Sr. punched the victim in the mouth and face until he fell. Once on the ground, Darryl Sr. continued to punch and kick him approximately 15 to 30 times. At some point the victim lost consciousness and sustained a concussion, as well as bruising to his upper chest and the left side of his face.

On September 21, 2021, the State filed a petition to adjudicate the seven children shared between Darryl Sr. and his girlfriend, including Darryl Jr. and Dimya, pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition alleged that in September 2021, Darryl Sr. caused bodily injury to a child in his care, he used inappropriate physical discipline, he ran from the home prior to the arrival of law enforcement, and law enforcement were unable to identify a suitable parent or legal guardian for Darryl Jr. and Dimya while on the scene. Additionally, Darryl Sr. had previously engaged in domestic violence with his girlfriend while in the presence of one of the children and generally failed to provide a safe and stable home, placing the children at risk of harm.

An amended petition was filed on November 30, 2021, which removed the allegation regarding inappropriate physical discipline but otherwise contained identical allegations set forth in the original petition. Darryl Jr. and Dimya were adjudicated in November 2021. They have remained out of the home since they were removed.

Darryl Sr. was later convicted of felony child abuse and a domestic assault involving his girlfriend. He was sentenced to a term of 3 years' imprisonment on February 9, 2022. The juvenile court appears to have entered its dispositional order in February 2022, though the order's details are unclear from our record on appeal. A case plan presented by the Nebraska Department of Health and Human Services (the Department), dated January 2022, included one goal for Darryl Sr.: upon his return home from incarceration, Darryl Sr. will provide a safe and stable home for his children that is free from domestic violence, and physical abuse against any of the children. Several review hearings were held during the case, occurring on May 20, November 1 and December 8, 2022; and February 23, May 19, and October 23, 2023. The goals of the Department case plans have been consistent throughout the case.

On December 1, 2023, the State filed a motion for termination of Darryl Sr.'s parental rights in regard to Darryl Jr. and Dimya, alleging statutory grounds to terminate Darryl Sr.'s rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State also alleged that termination of Darryl Sr.'s parental rights was in the children's best interests.

## 2. Trial

A termination trial was held over the course of 3 days in February 2024.

(a) Darryl Sr.'s Case Progress

Alyssa Lambrecht, the family's caseworker since March 2022, testified that Darryl Sr. was incarcerated from September 2021 to April 2023. Lambrecht met with Darryl Sr. monthly during his incarceration but acknowledged that the Department is generally limited on the services that can be provided to incarcerated parents. Darryl Sr. did participate in various educational programming offered through the prison, such as multiple parenting courses, a course on effective and healthy communication, and an anger management course.

No visits between Darryl Sr. and the children occurred during his incarceration, as he failed to complete the necessary paperwork. Darryl Sr. testified that he mailed the paperwork to Lambrecht in February 2023, shortly before his release. Darryl Sr. also requested video visits with his children when he had contact with Lambrecht, though it appears none were ever implemented.

Because minimal case progress had been made during Darryl Sr.'s incarceration, Lambrecht testified that it was important for Darryl Sr. to begin participating in services as soon as possible upon his release. When Darryl Sr. was released in April 2023, Lambrecht worked to set up visits for him and the children and ensure that a provider was available to give Darryl Sr. an updated initial diagnostic interview, which would determine the services in which he would need to participate.

Lambrecht informed Darryl Sr. that in order for the initial diagnostic interview to timely occur, he needed to be enrolled on Medicaid. Darryl Sr. did not complete the Medicaid enrollment process, despite reporting to Lambrecht that he had. Due to this delay, the initial diagnostic interview was not completed until August 2023. Darryl Sr. also completed the Circle of Security parenting course in September after having to restart the course due to his lack of attendance.

Darryl Sr.'s initial diagnostic interview recommended that he complete a dialectical behavior therapy course and a batterer's intervention program. Darryl Sr. began participating in a therapy course in October 2023 and at the time of trial was set to complete the last portion of the course within the month. He enrolled in a 30-week batterer's intervention program in December 2023.

Darryl Sr. also participated in supervised parenting time with his children. He had one virtual visit with Dimya in July 2023. Dimya's foster mother monitored the visit and testified that Dimya was visibly upset and crying after the visit concluded. Dimya reported to her foster mother that she did not recognize her father. Dimya also indicated that Darryl Sr. made her feel bad for not coming to an in person visit and that this discouraged her from wanting to have additional contact with him.

Whenever the foster mother brought up the potential of parenting time with Darryl Sr., Dimya expressed concern about whether she would be brought back to her placement at the conclusion of the visit. Dimya's foster mother continued offering Dimya the opportunity to attend parenting time with Darryl Sr. each week for about a month, until Dimya requested that she stop. No other visits between Darryl Sr. and Dimya occurred, because Dimya has repeatedly stated that she did not want to have in person parenting time with Darryl Sr.

Darryl Sr. was frustrated that Dimya did not want to see him. From Lambrecht's perspective, Darryl Sr. did not understand that it was Dimya's decision not to participate in his parenting time. Darryl Sr. instead questioned whether Dimya's foster parents were influencing her

or if a case professional was telling Dimya that she should not attend parenting time. Lambrecht tried to assure Darryl Sr. that no one was discouraging Dimya from attending parenting time, but that case professionals were leaving the decision up to Dimya.

In August 2023, Darryl Sr. refused to meet with Lambrecht unless Lambrecht brought Dimya with her to the meeting. Lambrecht found this concerning as it had already been explained to Darryl Sr. that no one was preventing Dimya from coming to visits. Darryl Sr. continued pushing to be able to see Dimya, despite Dimya herself articulating that she was not ready for these visits to take place. Lambrecht believed that it would have been traumatizing for Dimya to have been brought to the meeting without her consent, as it would cause Dimya to lose the sense of trust and security that she had recently gained through her time in therapy. The Department has a policy of not forcing children to participate in visits with family members if the children are old enough to verbalize that they do not want to attend a visit.

Lambrecht stated that she continues to monitor Dimya's readiness for parenting time with Darryl Sr. by having regular conversations with Dimya's counselor, Linda Dubs-Cerny, who has seen Dimya weekly since July 2023. Darryl Sr. called Dubs-Cerny in November 2023 and relayed that he understood that she "was the one that was keeping him from having visits with his daughter." Darryl Sr. did not otherwise ask Dubs-Cerny about Dimya's needs or therapeutic progress. Dubs-Cerny testified that if Dimya was displaying any readiness to participate in parenting time with Darryl Sr., she would inform the Department.

Darryl Sr. began having regular parenting time with Darryl Jr. in June 2023; the visits occurred in Darryl Sr.'s home three times a week, each lasting 4 hours. Lambrecht stated that there were no safety concerns and described the visits as "overall positive." A visitation worker who supervised Darryl Sr.'s parenting time stated that visits between Darryl Sr. and Darryl Jr. were consistent, and Darryl Jr. was generally excited to see his father. The visitation worker wrote to Lambrecht in late 2023 to recommend moving to unsupervised parenting time due to Darryl Sr.'s progress and Darryl Jr. specifically requesting unsupervised time with his father. At the time of trial, the Department was continuing to recommend supervised parenting time as Darryl Sr. had only recently begun making progress on his rehabilitative plan.

There were concerns regarding the lack of interaction between Darryl Sr. and Darryl Jr. during parenting time. Visitation notes taken during supervised parenting time and Darryl Jr.'s own reporting reflected that Darryl Jr. watched movies or played video games during a significant portion of parenting time with Darryl Sr. The Department wanted to see increased interaction between Darryl Sr. and Darryl Jr. in order to discuss the quality of interactions with other case professionals before moving Darryl Sr.'s parenting time to a lower level of supervision. Lambrecht encouraged playing outside, building with LEGOs, and playing board games, during parenting time. The visitation worker observed this type of interaction between Darryl Sr. and Darryl Jr. roughly once or twice a month. Darryl Sr. testified that Lambrecht had only communicated her concerns about Darryl Jr.'s screen time a week prior to trial.

The Department also had concerns regarding Darryl Sr. taking away electronic devices as a form of discipline when Darryl Jr. had reports of negative behavior from school. Sabina Hardesty, Darryl Jr.'s therapist since December 2023, testified that Darryl Jr. has been diagnosed with autism and "his functional level overall is lower." Hardesty characterized Darryl Jr.'s behavioral outbursts as trauma responses and noted that Darryl Jr. has experienced "significant" trauma in his life.

Hardesty stated that withholding items from Darryl Jr., a behavioral based approach, is not an effective form of discipline. Due to Darryl Jr.'s early life experiences, he believes that the world is not a safe place and that he is a "bad kid." A behavioral approach to discipline reinforces Darryl Jr.'s beliefs and further traumatizes him. Hardesty relayed her concerns regarding the form of discipline to Lambrecht, who communicated to Darryl Sr. that he should not be withholding things from Darryl Jr. during his parenting time. Based on visitation notes, Darryl Sr. did not follow this guidance and continued to withhold things as a form of punishment. Both the visitation worker and Darryl Jr.'s foster parent have reported to Lambrecht that Darryl Jr. frequently refuses to attend parenting time on the days when he gets in trouble at school.

(b) Children's Needs

Dubs-Cerny testified that she had been working with Dimya on expressing and identifying her emotions, coping with her past, and healing the symptoms of her trauma. Dimya has been diagnosed with post-traumatic stress disorder and presented associated symptoms such as nightmares, hypervigilance, issues regarding boundaries with strangers, and being generally quiet and fearful. During the first few months of Dimya's counseling sessions, she would play with dolls who were "just obsessed" with having enough to eat and a place to sleep, as well as "quite a bit of play of dolls beating each up and bleeding and needing help."

When Dimya arrived at her current foster placement in November 2022, Dimya's foster mother would observe Dimya backing away into a corner when she thought she was in trouble, in addition to Dimya's constant need for reassurance when she articulated a basic need. When Dimya attempted to fix a mistake, such as spilling water, she did so in a state of "sheer panic." At the time of trial, Dimya's foster mother described her as "happy," "funny," and "sweet."

Dubs-Cerny testified that safety is especially important for Dimya as she does not easily trust and focuses on keeping herself safe, which makes it difficult for her to develop healthy relationships with other people. A parent to Dimya would need to provide structure, predictability, and accountability for any "harmful things that would have happened."

Kerri Peterson was Darryl Jr.'s therapist from March to October 2023, and she testified that Darryl Jr. was often emotionally dysregulated and having behavioral issues during this time. Darryl Jr. was unable to attend roughly a quarter of his therapy sessions because he would become upset during his transportation, and it was unsafe for him to continue to be transported. Darryl Jr. did not make therapeutic progress with Peterson, due in part to his inability to emotionally regulate and his cognition deficits. Peterson was unable to discuss Darryl Jr.'s past or his relationship with Darryl Sr. because when these topics were broached, Darryl Jr. would become angry or shut down, which indicated to Peterson that Darryl Jr. was feeling unsafe or scared. Peterson terminated her services with Darryl Jr. after he became upset during a session and began to curse and throw things, ultimately destroying some items in Peterson's office.

Peterson noted that Darryl Jr. has highly specialized needs, including a safe and predictable environment, because autistic children do best when they are able to predict what behavior will cause what reaction. Darryl Jr. will also need therapeutic and educational supports. Peterson acknowledged that Darryl Jr.'s autism diagnosis and trauma history creates a heightened need for permanency.

Hardesty's therapeutic goals for Darryl Jr. included to work on "the wiring of his brain" to view the world as a safe place, increasing attachments to people in his life, regulating his body, and working with his school and his placement on how to manage his behaviors. During Hardesty's work with Darryl Jr., she has noticed a variety of trauma responses including an obsession with food and an intense anger. All of the behavioral issues exhibited by Darryl Jr. are consistent with stress caused by a lack of permanency. Hardesty stated that until Darryl Jr. achieves permanency, she is only able to manage his behaviors rather than assist him in healing from his trauma.

Lambrecht testified that in conversations she has had with Darryl Sr., he has been unable to recognize how his own actions have affected his children or to take accountability. He has not been able to associate his assault on his girlfriend's child with his own children's traumas. When Darryl Sr. was asked about the assault at trial, he denied that his children could have heard it, as it occurred in the home's basement surrounded by concrete. Lambrecht stated that Darryl Sr. could potentially make space for his children's emotions, but that had not occurred by the time of trial.

Darryl Sr.'s family members testified to a bond between Darryl Sr. and his children. Darryl Sr. testified that he was in compliance with all of his post-release orders including maintaining full-time employment, having a home, not engaging in any altercations, and passing urine analysis tests. Darryl Sr. also believed that having placement of his children was in their best interests.

Lambrecht testified that both Dimya and Darryl Jr. have an increased need for safety and security. Additionally, both children have behavioral issues, have individualized education plans, and need continued therapy. Lambrecht did not believe that reunification with Darryl Sr. was in the children's best interests at the time of trial. Lambrecht was unsure of how long it would take Darryl Sr. to complete his rehabilitative plan, though she did not believe that reunification could occur in the near future.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on May 17, 2024, terminating Darryl Sr.'s rights to Darryl Jr. and Dimya. The court found that the State had met its burden of proving grounds for termination under § 43-292(2), (6), and (7). The court further found that Darryl Sr. was an unfit parent and that it was in the best interests of the children to have Darryl Sr.'s parental rights terminated.

Darryl Sr. appeals.

## III. ASSIGNMENTS OF ERROR

Darryl Sr. assigns that the juvenile court erred by (1) finding that statutory grounds to terminate were established by clear and convincing evidence and (2) finding that the termination of his parental rights was in the children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

- 6 -

## V. ANALYSIS

### 1. Statutory Grounds for Termination

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7). Darryl Sr. assigns that the State failed to prove that the children were within the meaning of any of the three statutory subsections at issue but argues only that because he was not provided reasonable efforts, the juvenile court's finding that § 43-292(6) was proven was in error. Darryl Sr. does not argue that the statutory grounds under § 43-292(2) and (7) were not proven. See *Evert v. Srb*, 33 Neb. App. 244, 13 N.W.3d 728 (2024) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, Darryl Jr. and Dimya have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Darryl Sr.'s care on September 19, 2021, and have remained out of the home since their removal. The State filed the motion for termination of parental rights on December 1, 2023. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). At the time of filing, the children had been in out-of-home placement for over 26 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that Darryl Jr. and Dimya had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Darryl Sr.'s parental rights exist.

### 2. Parental Unfitness and Best Interests

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental

- 7 -

obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Darryl Sr. argues that his only barrier to case progress was his incarceration and that upon his release he substantially complied with his rehabilitative plan and had positive parenting time with Darryl Jr.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S., supra*. And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id*.

It was Darryl Sr.'s own actions that caused him to be incarcerated and therefore unable to make meaningful progress on his rehabilitative plan until his release, over 18 months after his children were removed the home. And the nature of Darryl Sr.'s criminal conduct involved violence toward another child. Not only did Darryl Sr.'s incarceration cause a stagnation in case progress, but Darryl Sr. has yet to fully acknowledge that the assault which led to his incarceration may have been traumatizing for his children. Even at the time of trial, Darryl Sr. denied that his children could have been aware of his assault of another child in the family home because it occurred in the basement. Both children's mental health providers testified that they need a parent who is able to provide safety and security. According to her counselor, Dimya especially needs a parent who is accountable for the past harm done.

Darryl Sr. again demonstrated a lack of accountability when he blamed others for Dimya's lack of participation in parenting time. Despite Lambrecht repeatedly explaining that Dimya herself had decided not to spend any time with Darryl Sr., beyond the one video visit in July 2023, Darryl Sr. continued to assume that Dimya's counselor or foster parents were influencing her decision. When Darryl Sr. called Dubs-Cerny to confront her, he did not ask what Dimya would need in order to start attending visits or otherwise ask about her therapeutic progress.

Darryl Sr. had consistently been participating in parenting time with Darryl Jr. However, the parenting time remained fully supervised, as Lambrecht and other case professionals were unable to evaluate the quality of interactions between Darryl Sr. and Darryl Jr. because Darryl Jr. spent a significant amount of the parenting time watching movies and playing video games. Very little interactive activity occurred during this parenting time.

Additionally, it is concerning that Darryl Sr. ignored guidance from Darryl Jr.'s therapist regarding appropriate ways to discipline and he continued to withhold items from Darryl Jr. upon receiving negative behavioral reports from school. Hardesty testified that taking a behavioral based approach to discipline reinforces Darryl Jr.'s harmful beliefs about himself and the world and risks

further traumatizing Darryl Jr. It is important that Darryl Jr.'s parent collaborate with his therapist and other supports given Darryl Jr.'s autism diagnosis and significant trauma history.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Darryl Sr.'s ability to be accountable to his children and desire to collaborate with their professional supports over the course of the case.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Darryl Jr. and Dimya have been in foster care since September 2021. The children's mental health providers testified to their increased need for permanency due to their trauma history, diagnoses, and behavioral needs. They deserve stability and should not be suspended in foster care when Darryl Sr. is unable to rehabilitate himself. Accordingly, we find there was clear and convincing evidence to show that Darryl Sr. was unfit and that terminating his parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Darryl Sr.'s parental rights existed under § 43-292(7) and that termination of his parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.