IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ELIJAH W. & FRANKLIN W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ELIJAH W. & FRANKLIN W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALAXANDRIA W., APPELLANT.

Filed December 16, 2025.    No. A-25-271.

Appeal from the Separate Juvenile Court of Sarpy County: JONATHON D. CROSBY, Judge. Affirmed.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellant.

Andrew T. Erickson, Deputy Sarpy County Attorney, for appellee.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Alaxandria W. appeals from an order of the separate juvenile court for Sarpy County, terminating her parental rights to two of her children. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Alaxandria is the biological mother of Franklin W., born in April 2020, and Elijah W., born in November 2021. The children share the same biological father who is not a part of the appeal before us now and will not be discussed further.

In May 2023, a juvenile petition was filed to adjudicate Franklin and Elijah pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on the actions of Alaxandria. Specifically, the petition alleged that Alaxandria had recently been arrested for driving under the influence while the children were in the car; she was presently incarcerated; her use of alcohol and/or controlled substances placed the children at risk for harm; she had engaged in domestic violence; and she had failed to provide the children with proper care, supervision, support, or a safe and stable home. The State also filed a motion for an ex parte order of removal, which was granted by the juvenile court on May 25. Franklin and Elijah have remained out of the home since they were removed.

On October 17, 2023, the juvenile court entered an order adjudicating the children. Pursuant to a plea agreement, the State dismissed the allegations in the petition regarding Alaxandria's driving under the influence and engaging in domestic violence. Alaxandria admitted to the remaining allegations in the petition.

The juvenile court entered a dispositional plan as to Alaxandria on December 6, 2023, adopting the case plan presented by the Department of Health and Human Services (the Department). The court specifically ordered that Alaxandria participate in supervised visitation with her children, complete an intensive outpatient program (IOP), participate in individual therapy, participate in a parenting class, participate in Alcoholics Anonymous (AA) meetings, participate in a domestic violence class, comply with the requirements of her probation, find and maintain safe and stable housing for herself and her children, sign all releases of information, and report any law enforcement violations to her case manager within 24 hours. Alaxandria's case plan goals included maintaining her sobriety and mental health to provide a safe and stable environment for children and identifying healthy coping skills and treatment while addressing her mental health and substance use concerns.

Several review hearings were held during the case, occurring on April 12, June 11, August 28, and November 13, 2024. Following the review hearing on August 28, the juvenile court ordered that Alaxandria also participate in a psychological and parenting assessment, complete a co-occurring evaluation, and meet the requirements of drug court until discharged. Following the review hearing on November 13, the juvenile court ordered that Alaxandria may have supervised telephonic visits when she was released from incarceration. The goals of Alaxandria's court adopted plans have been consistent throughout the case.

On August 29, 2024, the State filed a motion for termination of Alaxandria's parental rights to Franklin and Elijah, alleging that statutory grounds to terminate Alaxandria's rights existed pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 2016). The State also alleged that termination was in the children's best interests.

## 2. TRIAL

The termination trial was held on March 14, 2024. The following evidence was adduced.

### (a) Substance Use and Incarceration

The affidavit for removal stated that per the Department's records search, Alaxandria had been charged with two felonies on the day of the children's removal: driving under the influence .15+ or refusal "(2 prior conv)" and intentional child abuse (no injury). It appears that Alaxandria was incarcerated at the Sarpy County Jail from the time of her arrest in May 2023 to July 25, 2023.

Matthew Goldapp, Alaxandria's probation officer, testified that Alaxandria participated in drug court. She was ordered to obtain and complete treatment, participate in drug testing, attend court regularly, meet with Goldapp regularly, and attend any additional classes or treatment ordered by the court.

Following her release from jail, Alaxandria was accepted at Lydia House in Omaha to complete their long-term inpatient treatment program. Alaxandria was unsuccessfully discharged after a few weeks because she left the grounds without permission to gather some items from her apartment, thus breaking the facility's rules. Alaxandria was taken back to jail and was released again on October 25, 2023.

Alaxandria then started IOP at Valley Hope in Omaha. She was successfully discharged from IOP on January 26, 2024. The IOP coordinator of Valley Hope reported to Heidi Von-Baruth, the family's case manager since July 2023, that while Alaxandria's attendance and contributions in the group were acceptable, "it's hard to say that she's made great progress in addressing the underlying aspect of her past substance use and working to resolve and move forward from such issues." Valley Hope had no treatment recommendations for Alaxandria upon her discharge.

During IOP, Alaxandria moved into Healing Stone, a sober living house in Omaha. She was evicted from Healing Stone on January 14, 2024, due to the house manager believing that she was intoxicated on Phenibut. Goldapp testified that Phenibut is a substance which can be "obtained at nutrition stores and gives the same basic effects that alcohol does, and it's also something we could not test for." The Healing Stone house manager also reported that Alaxandria became aggressive, causing staff to call the police. Alaxandria reported to Von-Baruth that she was not intoxicated that evening, but, rather, the house manager did not like Alaxandria and wanted to find a way to have her evicted from Healing Stone. Because an eviction from a sober living home is a drug court violation, Alaxandria had to spend 24 hours in jail as a result.

After Healing Stone, Alaxandria was accepted by Oxford House in Bellevue on January 16, 2024. However, a month later she was evicted from this facility due to suspected substance use. Alaxandria was then accepted by Oxford House in Omaha on February 16 but was evicted within a week for suspected substance use and suspected drug test tampering. Alaxandria then resided in an extended stay motel as Goldapp was unable to find another sober living house that would accept her. Alaxandria moved into Michael House in Omaha, another sober living facility, shortly before she was arrested on March 6.

A case plan dated April 2, 2024, stated that Alaxandria had been incarcerated since March 6, after she was charged with felony driving under the influence (fifth offense), careless driving, no proof of ownership, and speeding. Alaxandria was further charged with unauthorized use of financial transaction device. It was Von-Baruth's understanding that Alaxandria had stolen credit card numbers from her part-time job to purchase Phenibut.

Goldapp did not have concerns about Alaxandria's alcohol use but was concerned about her use of Phenibut. When Alaxandria was removed from Healing Stone, she had bottles of Phenibut in her possession. Alaxandria also had empty bottles of Phenibut in her car when she was stopped on March 6. Goldapp stated that Alaxandria had tested negative for alcohol throughout her involvement in drug court.

Though Alaxandria successfully completed treatment at Valley Hope, she did not successfully complete probation. Alaxandria was never allowed to level up in drug court and spent

several days in jail due to drug court sanctions. Alaxandria received sanctions for being evicted from various sober living homes and for having someone other than a meeting coordinator sign two of her AA cards. According to Goldapp, Alaxandria was sanctioned to "two 24-hour jail stays" for each signature he could not verify. Alaxandria did not report any law enforcement or drug court violations to Von-Baruth. Von-Baruth was in touch with Goldapp and he reported the violations to her. Alaxandria's probation was violated after she received new charges on March 6, and she was removed from the drug court program.

Certified copies of judgment and sentencing orders entered on November 18, 2024, by the Sarpy County District Court show that Alaxandria pled guilty to one count of driving under the influence (third offense), a Class W misdemeanor, and one count of child abuse, a Class IIIA felony. The district court sentenced Alaxandria to 1 year's imprisonment for her driving under the influence conviction and to 3 years' imprisonment for her child abuse conviction. Von-Baruth was unaware as to when Alaxandria was going to be released.

Amanda Stocking, case manager for the Nebraska Department of Correctional Services, testified that Alaxandria had been at the Nebraska Correctional Center for Women in York since November 2024. Alaxandria than moved to the Community Corrections Center in Lincoln in January 2025. Since arriving at the Community Corrections Center, Alaxandria had completed a required IOP, as well as voluntary programming focused on empowerment, wellbeing, parenting, and reentry. At the time of trial, Alaxandria was participating in the work release program. Alaxandria had been drug testing negatively and Stocking reported no concerns regarding any substance use by Alaxandria. Stocking testified that Alaxandria was expected to be released in April 2025, less than a month after the termination trial.

(b) Visitation

Alaxandria began having virtual visits with her children while she was incarcerated in October 2023. She had supervised in-person visitation with the children after she was released from jail in late October 2023 until her subsequent arrest and detainment in March 2024. She initially had 6 hours of supervised visitation per week, which was increased to 10 hours per week in December 2023.

Shalynn Sims, Alaxandria's family support worker, supervised Alaxandria's visitation from October 2023 to January 2024. She observed Alaxandria to have a good bond with the children and that the children were always excited to see their mother. Sims had no concerns regarding Alaxandria's parenting skills. The Department's case plans generally noted that Alaxandria struggled to have consistent visitation with her children, but the number of missed visits is not clear from our record.

The children's foster mother reported to Von-Baruth that the children acted out after returning from visits with Alaxandria. While in-person visits were occurring, Elijah had an increase in biting incidents and Franklin was more agitated. A case plan dated February 20, 2024, also noted that Elijah had a history of biting other children and adults at his daycare.

In February 2024, a visitation worker reported to Von-Baruth that Alaxandria had behaved oddly at a recent visit. She had fallen asleep, was excessively "messing with her hair," picked her toenails, and rubbed and scratched her inner thighs. Visits between Alaxandria and her children stopped when Alaxandria was arrested on March 6.

In the summer of 2024, after in-person visitation with Alaxandria had ceased, the foster mother reported to Von-Baruth that the children's behaviors had greatly improved. Elijah had stopped biting others and had fewer tantrums. Both children fought with one another less and were generally better behaved at home. The children's Court Appointed Special Advocate (CASA) likewise testified that Elijah and Franklin have flourished outside of Alaxandria's care and that she has observed that they have learned how to take turns, accept boundaries, and be polite.

Alaxandria made phone calls to the children while she was incarcerated. It appears that these calls were coordinated between Alaxandria and the foster mother and that there was not a set schedule. The foster mother reported to Von-Baruth in the fall of 2024 that Franklin's behaviors seemed to be triggered after phone conversations with Alaxandria. Elijah was not interested in speaking with Alaxandria and seemed to be "unfazed" when she called.

Von-Baruth testified that Franklin had been seeing an individual therapist for a few months. The therapist "didn't recommend telephone visits with Franklin" because the phone calls were too unsettling for him. After the telephone calls, Franklin would demonstrate defiant behaviors. Von-Baruth testified that the therapist's recommendation was based on "establishing more of a routine and helping the children to feel loved and safe." Von-Baruth could not recall when the last phone call between Alaxandria and Franklin took place.

The children's CASA testified that the foster mother had recently blocked Alaxandria from having any contact with the children, though she was unable to recall how long this had been occurring. The CASA acknowledged that there was no court order precluding contact between Alaxandria and the children. Alaxandria had sent two pieces of mail for the children to their foster home.

(c) Case Plan Progress

Between her periods of incarceration, Alaxandria worked part-time as a server at a restaurant and as a dental assistant. In the spring of 2024, it was reported to Von-Baruth that Alaxandria was intoxicated while serving on more than one occasion and was asked to leave work on those days.

Alaxandria never completed her required domestic violence class. Von-Baruth connected with a Child Savings Institute staff member who stated that she would reach out to Alaxandria to get her registered for domestic violence classes and a support group. On February 16, 2024, Alaxandria informed Von-Baruth that she would not be doing anything else the Department asked of her unless her attorney recommended it. Sims later told Von-Baruth that she would work on getting Alaxandria re-registered for the domestic violence class. Alaxandria did successfully complete the Circle of Security parenting class in February 2024.

Alaxandria reported to Von-Baruth that she was in individual therapy, but Von-Baruth did not know with whom and whether Alaxandria had signed a release of information for this therapist. In a meeting on February 9, 2024, Alaxandria told Von-Baruth that she was going to be a patient at a specific counseling office but that she had not signed a release of information as she did not know who her therapist was. Alaxandria also told Von-Baruth that she was going to have a psychiatric evaluation at "CHI in Bellevue" but no other information was provided to Von-Baruth.

Von-Baruth testified that a referral was done for Alaxandria to have a co-occurring evaluation. The referral was accepted by an agency, but Alaxandria was incarcerated at that time and the agency was unable to contact jail staff.

The children's CASA believed that the children should be adopted as Alaxandria had been away from the children for a "significant period of time in their young [lives]." The CASA noted that due to Alaxandria's incarceration, she was not having continuity or any kind of relationship with Franklin or Elijah.

Von-Baruth testified that Alaxandria had not put herself in the position to care for her children. Von-Baruth stated that the case had been open for nearly 22 months at the time of trial and that Alaxandria was not incarcerated for only 4 of those months. Considering the young ages of the children, Alaxandria had spent little time with them over the course of their lives. Von-Baruth believed that it was in the children's best interests to be adopted due to Alaxandria's instability.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on March 25, 2025, terminating Alaxandria's rights to Franklin and Elijah. The court found that the State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and (7). The court further found that Alaxandria was an unfit parent and that it was in the best interests of the children to have Alaxandria's parental rights terminated.

Alaxandria appeals.

## III. ASSIGNMENTS OF ERROR

Alaxandria assigns, restated, that the juvenile court erred in (1) finding that there was clear and convincing evidence that statutory grounds for termination existed, and (2) finding that it was in the best interests of the children to terminate her parental rights.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(2) and (7). Regarding § 42-292(7), Alaxandria argues that while the children have been in out-of-home care, the State failed to demonstrate her parental unfitness. We will address Alaxandria's parental fitness along with the best interests of the children below.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7)

operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Alaxandria's care on May 25, 2023, and have remained out of the home since their removal. The State filed the motion for termination of parental rights on August 29, 2024. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). At the time of filing, the children had been in out-of-home placement for 15 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

Alaxandria also argues that the State failed to present sufficient evidence to establish that she had substantially and continuously or repeatedly neglected her children for the purposes of § 43-292(2). If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Alaxandria's parental rights exist.

## 2. BEST INTERESTS AND UNFITNESS

Alaxandria also assigns that the juvenile court erred in finding that it was in the children's best interests to terminate her parental rights. In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Alaxandria argues that she made consistent and meaningful progress in the juvenile case, including completing substance abuse treatment, parenting classes, and regularly participating in

supervised visits. Alaxandria points to Sims' testimony, which confirmed a strong bond with her children and no concerns as to safety or Alaxandria's parenting skills.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.*

Alaxandria has been incarcerated for most of the juvenile case. Except for the period between late October 2023 and early March 2024, Alaxandria has been incarcerated for substance related offenses. Though Alaxandria has completed some voluntary programming following her arrest on March 6, 2024, the evidence at trial demonstrated that Alaxandria's periods of incarceration limited her ability to have in-person visitation with the children or meaningfully participate in her case plan.

During the time Alaxandria was not incarcerated, she struggled to find stability and to maintain her sobriety. Though she had successfully completed IOP in January 2024, the IOP coordinator questioned whether Alaxandria had sufficiently addressed the underlying aspect of her past substance use. Alaxandria was evicted from four different sober living homes for noncompliance with the facility's rules or for suspected substance use. It was also reported to Von-Baruth that Alaxandria had been intoxicated at work. Alaxandria was again arrested for a substance use related charge a little over 4 months after she had been released from jail. Given that the precipitating event to this juvenile case was Alaxandria driving under the influence while the children were in the car, Alaxandria's substance use placed the children at a continued risk of harm.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Alaxandria's ability to maintain sobriety outside of incarceration.

Though Sims testified that the in-person visitation between Alaxandria and the children was a positive experience, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Additionally, evidence at trial demonstrated that since Alaxandria's subsequent incarceration, the children no longer looked forward to the telephonic visits. After the phone calls, Franklin became so agitated that his therapist recommended the calls with Alaxandria cease and Elijah was uninterested in speaking with Alaxandria. We also note that during the 4 months Alaxandria was having in-person visitations, the visits remained fully supervised.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *See In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Franklin and Elijah have been in foster care since May 2023, when they were 3 and 1 years old, respectively. The juvenile court in its termination order stated that the children "are long overdue for stability, permanency, happiness, and a consistent family environment." We agree. Franklin and Elijah should not be suspended in

foster care when Alaxandria is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Alaxandria was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Alaxandria's parental rights existed under § 43-292(7) and that termination of her parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.