IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KENZINGTON E. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KENZINGTON E. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JAMEE B., APPELLANT, AND KASEY E., APPELLEE AND CROSS-APPELLANT.


Filed December 30, 2025.   Nos. A-25-327 through A-25-330.


Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Rhonda R. Flower, of The Law Office of Rhonda R. Flower, for appellant.

Allison M. Witcofski, of Douglas, Kelly, Ostdiek, Snyder, Ossian & Vogl, P.C., for appellee and cross-appellant.

No appearance for appellee.


RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Jamee B. appeals from four separate orders of the Scotts Bluff County Court sitting as a juvenile court, terminating her parental rights to her four children. Kasey E. cross-appeals from the orders which relate to three of the children. We have consolidated the juvenile cases and upon our de novo review of the record, we affirm the juvenile court's orders.

- 1 -

## II. STATEMENT OF FACTS

Jamee is the biological mother of Kenzington E., born in January 2014; Kaidynce E., born in March 2016; Kaizleigh E., born in November 2017; and Kopelyn E., born in April 2019. Kasey is the biological father of Kenzington and Kaizleigh and the legal father of Kopelyn.

### 1. PROCEDURAL HISTORY

The children were removed from Jamee's home on May 26, 2023, following a report of domestic violence between Jamee and her husband at the time. Separate petitions were filed on May 30 to adjudicate Kenzington, Kaidynce, Kaizleigh, and Kopelyn pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on the history of domestic violence in the home, prior interventions that had failed to correct the issues in the home, the failure to provide the children with a safe and stable home, and Kasey's failure to protect the children. The children were adjudicated in July 2023. They have remained out of the home since they were removed.

The juvenile court entered a dispositional plan on September 22, 2023, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Both Jamee's and Kasey's case plan goals included working with the Department and their identified support system to develop a plan and show everyone they can safely and appropriately parent the children at all times as demonstrated by consistently addressing mental health and substance use needs, providing a safe and stable living environment for themselves and their children, actively engaging with and building positive bonds with the children, and continually strengthening and utilizing a positive safety and support network. Several review hearings were held during the case, occurring on December 12, 2023; March 6, 2024; April 3; May 15; June 12; and September 11. The goals of the court adopted plans have been consistent throughout the case.

On October 24, 2024, the State filed separate motions for termination of Jamee's and Kasey's parental rights to their respective children, alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2), (4) (6), and (7) (Reissue 2016).

### 2. TRIAL

A termination trial was held over 2 days in March 2025.

#### (a) Case Origins

Chasity Quijas, an initial assessment worker for the Department, testified that she had worked with the family in late 2022 on a voluntary case. Following allegations of domestic violence and inappropriate boundaries between the children, Jamee agreed to a voluntary case plan including mental health counseling, parenting classes, and visitation. During the voluntary case, the four children primarily stayed with Kasey and the Department arranged for intensive family preservation for Kasey and the children. Quijas transferred the voluntary case shortly after setting up the ongoing services and was unaware of Jamee's or Kasey's case progress. According to Quijas, Department documents stated that the case was closed unsuccessfully in April 2023.

In May 2023, a domestic violence incident occurred between Jamee and her husband at the time (not Kasey) in the presence of the children. Quijas testified that Jamee's husband suffered a black eye, and Jamee had hit his truck with a metal bar. Kasey was not involved in the May 2023 allegations and was living in Colorado at the time. Shortly after their removal, Kenzington,

Kaidynce, and Kaizleigh were interviewed and disclosed multiple incidents of Jamee and her husband fighting in front of them. At trial, Jamee acknowledged that she hit her husband because she had learned that he had been using drugs and she became upset. Jamee and her husband are no longer a couple, though it is unclear from our record when they separated.

The children were placed with Kasey's mother and her husband, Ty G. Ty testified that when Jamee and Kasey had been in a relationship, he would pick up the children from the home once a week due to the couple "having problems or whatever[.]" Ty was notified about the couples' fighting by either Jamee, Kasey, or the police department. Ty had also picked the children up two or three times when Jamee was in a relationship with her former husband.

As discussed further below, Kopelyn was diagnosed with leukemia in the spring of 2023 and was in remission at the time of trial. Jamee resided in Denver, Colorado, with Kopelyn during his treatments from March to October 2023. During a weekend trip back to Nebraska, Jamee and her husband had the fight which led to the children's removal. Though Kopelyn is in remission, he continues to have monthly medical appointments in Denver, which both Jamee and the children's placement attend. Ty noted that during Kopelyn's medical appointments in Denver, Jamee is always composed.

(b) Jamee's Case Plan Progress

Emma Timm, the family's caseworker since July 2024, testified regarding Jamee's case plan. Jamee completed an adult integrated addiction and mental health evaluation on October 9, 2023. Timm testified that the evaluation "recommended that Jamee follow through with the recommendations of a mental health evaluation." During the juvenile case, Jamee was on probation for a financial crime. Jamee's probation requirements included having a random urinalysis once a month and sweat patch testing twice a month. At the time of trial, Jamee had taken 106 drug tests and had only once tested positive. A sweat patch on December 12, 2023, tested positive for methamphetamine. Her urinalysis during that same period was negative. Jamee testified that she anticipates being discharged from probation in 2026.

A psychological evaluation of Jamee was completed on February 23, 2024. According to Timm, the evaluation diagnosed Jamee with attention-deficit/hyperactivity disorder, post-traumatic stress disorder (PTSD), and personality disorder with antisocial and dependent features. The evaluation recommended that Jamee participate in intensive outpatient counseling.

Christine Dawson, a licensed independent mental health practitioner, has seen Jamee for weekly therapy since February 2024. Timm had reached out to Dawson twice through email but has not received a response and therefore was unaware of Jamee's therapeutic treatment goals. Dawson was unaware if Jamee had ever signed a release of information, allowing Dawson to communicate with other case professionals, including the children's therapists.

Dawson testified that Jamee's treatment goals are to stabilize her mood, process her trauma, work on her self-esteem, and identify relationship issues. Dawson described Jamee as a consistent and cooperative client. Dawson had not seen the psychological evaluation but did not believe that Jamee had a personality disorder. She noted that women like Jamee, who have had traumatic childhoods, often get misdiagnosed with personality disorders. Dawson had "[n]ever seen anything like that on Jamee."

- 3 -

Dawson testified that Jamee has done well in therapy, and that her greatest accomplishment has been her recognition that she does not select healthy people to be in relationships with. Jamee has been able to take responsibility for her role in the domestic violence dynamic with her former husband as well as her anger issues. Jamee has often shown remorse to Dawson for "the things that her children have been exposed to as a result of her actions." If Jamee were to continue with individual therapy, Dawson predicted a "fairly good prognosis." However, if Jamee were to abruptly discontinue therapy, she would have a "minimal outlook."

Dawson also acknowledged that she had not received any collateral information from the juvenile case, including any evaluations or Jamee's parenting assessment. Jamee also had not disclosed her prior instances of domestic violence with Kasey. Dawson noted that she has not worked on any relational issues between Jamee and her children and does not specialize in familial reunification.

Jamee completed the Love and Logic parenting class as well as participated in a women's trauma group in early 2024. Jamee also completed a parent-child interaction assessment on March 7, 2024. At trial, Timm read the evaluators' findings from the assessment:

> I didn't really find any major fault in Jamee's interactions with her children. I did, however, have the impression that she tends to be rather passive and self-absorbed, but is willing to be open to receiving the attention of her children when they request it.

> She didn't initiate any activities or interactions during the time that I met with them and interacted with them primarily through the movie and through sharing snacks. I would imagine that Jamee does reasonably well as a parent when her children do not want very much from her.

During the case, Jamee participated in fully supervised visitation with the children. However, Kopelyn had been diagnosed with leukemia in March 2023, shortly before the juvenile case began, and Jamee stayed in Denver for his treatment. On the approval of Kopelyn's doctor, he and Jamee returned to Nebraska only three times for short stays between February and October 2023. During this time, Jamee participated in video visits with the other three children.

Jamee was initially offered 15 hours of supervised visits a week, which was increased to 30 hours a week in July 2023. Visitation decreased to 10 hours a week in September 2023 due to Jamee's inability to attend visits while she was in Denver with Kopelyn. Visitation hours were then increased to 12 hours a week in May 2024 when both Jamee and Kopelyn were back in Nebraska.

Jamee obtained her own apartment in September 2024 and her visits with the children moved to her home shortly thereafter. Rachel Ross, a community support worker at Cirrus House, worked with Jamee in June 2024 on housing assistance. Ross stated that Jamee was easy to work with and was an active participant who would follow up on directives. Ross visits Jamee's apartment monthly and described the apartment as beautiful, clean, and very homey.

Timm testified that Jamee has been "fairly consistent" in her visitation attendance throughout the case. Jamee testified that she has repeatedly requested additional visitation hours but was told by Timm that Lori Rodriguez-Fletcher, Kenzington's and Kaidynce's therapist, was denying her additional hours. Ty testified that he and his wife have offered Jamee additional, informal visits at the children's placement, but Jamee has not taken them up on the offer.

Visitation has remained fully supervised throughout the entirety of the juvenile case. Timm testified that Jamee has not progressed to unsupervised visits, because the Department had concerns that "Jamee is questioning the children during visitation, which could lead to coaching." Timm testified that during her visits, Jamee would discuss the juvenile case and would ask the children about their therapy, their placement, and Kasey's visitation. Timm believed that the questions Jamee was asking the children during visitation was undermining their progress in therapy. Additionally, Jamee tries to persuade the children "to say certain things to certain people," such as telling the children they could not repeat certain information to their grandparents at their placement.

Dacia Boyer, a Guardian Light family support worker who supervised Jamee's visits from October 2023 to January 2025, testified that there were times that Jamee would talk about the juvenile case or case professionals at visits. When this occurred, Boyer redirected Jamee. Boyer could only recall one occasion where Jamee had asked the children about their placement, which was when Jamee asked Kopelyn about getting a bath and whether his feeding tube was being cleaned.

Jamee denied speaking negatively about Rodriguez-Fletcher during her visits with the children. Jamee noted that she made a comment to Ty during one of Kopelyn's hospital stays that Jamee did not like or trust Rodriguez-Fletcher, and that this could have been repeated to the children.

Timm also testified to concerns brought up by Jamee herself that without "the visitation notes we wouldn't be able to corroborate, or . . . fully investigate those concerns." For example, a couple of months before trial, Jamee alleged that Ty was "smacking the girls' butts and calling them sexy." Kenzington and Kaidynce were forensically interviewed and neither one made a disclosure of sexual abuse at that time. Timm testified that Jamee has made several allegations regarding the children's placement including allegations of spanking, sexual abuse, cursing in front of the children, breaking one of the children's cell phones, and issues with their sewage after Kopelyn had tested positive for giardia. According to Timm, none of these allegations have been founded and the Department did not have any safety concerns for the children in their current placement.

Jamee testified that she is frustrated by the lack of action following her reports of the children's disclosures. She stated that her "goal is to not come out here and try to attack other people, but when it comes to the safety of my children, I have to take it seriously."

Dixie Hampton, a Guardian Light family support worker who supervised Jamee's visits from March 2024 to January 2025, testified that she witnessed the children making disclosures to Jamee during their visits. Hampton testified that she observed, and documented in her visitation notes, that the children told Jamee that Ty told them to call him "sexy grandpa." Another time, Kaidynce was bruised and told Jamee that Ty had hit her with a belt. When these things were shared with Jamee, Jamee would be upset and make a report to the caseworker. Hampton testified that she found this to be a good reaction.

Rodriguez-Fletcher followed up with the children following their disclosures to Jamee during visitations. Rodriguez-Fletcher believed that because the children had suffered significant trauma, they try to please others and keep the peace, "so I do think that there are times that they tell Jamee things because they do worry about her getting mad or they know that she does not like

- 5 -

the foster parents and the foster parents don't really get along with her either." Rodriguez-Fletcher shared Timm's concerns that Jamee was leading the children.

Tony Ketcham, a family support supervisor at Guardian Light Family Services, worked with Jamee from June 2023 until February 2025. The Department had recently found another company to supervise Jamee's visits and what "was told to me is that the Department wanted to get a different agency's perspective on how things were going with the kids[.]" Ketcham testified that the Department felt that the visitation workers may have been biased. Ketcham also testified that the Department raised concerns about hearing reports from the children to Rodriguez-Fletcher or their guardian ad litem which were different than that captured by the visitation notes. Ketcham discussed this discrepancy with his workers, who denied observing anything at Jamee's visitation which was not also captured in the visitation notes. Ketcham conceded that in January 2025, Jamee had recorded a part of the visitation, which was not reflected in the visitation notes.

Jamee acknowledged that she had made a recording during a visit. Kaidynce had described to Jamee that Ty sometimes gets frustrated and grabs Kopelyn by the hair on the back of his head and tells Kopelyn to take his medication or he would be spanked. When Kaidynce was describing this to Jamee, Jamee recorded the conversation to show Timm and the Department generally "because this is stuff that is being said in my visits, but I am being called a liar because they are not disclosing it to them because they associate them with being removed." The visitation worker who was present at the visit testified consistently regarding Kaidynce's statement. The worker did not observe Jamee to be recording at the visit. The worker only became aware of the recording after being told by Ketcham.

Heavin Thaden, a Guardian Light family support worker who supervised Jamee's visits from May 2023 to December 2023, testified that she was removed from Jamee's case for boundary issues, but a specific incident was never identified. Thaden testified that the Department believed that Jamee was too close to her and saw Thaden as a friend, rather than a family support worker. Thaden denied that she was friends with Jamee, or that the two were inappropriately close. Thaden testified that it is "our job to hear concerns and to offer Jamee support. I never felt that I stepped outside of that boundary."

Timm also testified that despite her concerns, Jamee does well with the children during her visitation. She creates a routine, provides them with meals, and interacts with them. Hampton, Boyer, and Thaden testified consistently that Jamee had made positive improvements in her ability to parent. When Jamee first started having supervised visitation, she would often raise her voice to get the children to listen to her. The visitation workers noted Jamee utilizing coping skills from her therapy and the Love and Logic curriculum to stay calm and avoid feeling overwhelmed. Jamee started to offer the children choices and consequences and would put them in time-outs when they acted out. Jamee was receptive to the visitation workers' redirection and demonstrated an ability to meet the children's physical and emotional needs. The workers noted no safety concerns.

The visitation workers also noted that the quality of visits improved once they moved from the visitation center to Jamee's apartment. The workers described Jamee's apartment as clean and tidy. Jamee acquired posters for the walls of the children's bedrooms and bedsheets in their favorite colors. Jamee implemented a routine where the children helped cook meals and had assigned chores. Dinners were eaten together at the table and Jamee would then have the children take a bath and get ready for bed before they were returned to their placement. The workers disagreed

that Jamee was a passive parent, noting that she initiated activities and planned outings for the children. Jamee accompanied her children to their extracurriculars during her visitations. The workers also noted that the children and Jamee were affectionate toward one another.

Melissa Santana, a supervisor of family support workers at Valor Counseling and Support, has worked with Jamee since February 2025. Santana testified that Jamee is consistent with her visitation and is always well prepared. Jamee's need for redirection is minimal and the only safety concern noted by Santana is that the children like to jump on the couch, though Jamee redirects them. Santana agreed that one of her workers had documented Jamee asking Kaidynce if "Papa was calling Kaidynce sexy and smacked her butt." The worker provided Jamee with a warning and Jamee did not ask again. Santana believed that this question was appropriate "because it would be a concern."

A week prior to trial, Kenzington had stopped wanting to attend visits with Jamee but had not given a reason why. Santana testified that because Kenzington has not been attending visits, Jamee had requested having one-on-one visits with Kenzington on Fridays.

Sadee A., Jamee's sister, testified that since the children were removed, Jamee "has done everything to get the children back." Sadee has joined some of Jamee's visitations and has noticed an improvement in Jamee's reactivity. Sadee believes Jamee can meet her children's physical and emotional needs.

Since November 2024, Jamee had been working as an office manager and marketing manager at Intralinks Technical Solutions. Jamee has been employed since she returned from Denver in the fall of 2023. In this time, she has had three previous jobs before working at Intralinks.

In September 2024, Jamee was ordered to participate in child-parent psychotherapy (CPP). Timm testified that CPP is for children 5 and under. After speaking with Rodriguez-Fletcher, it was determined that only Kopelyn was young enough for this particular therapy. The Department then offered Jamee the option of working with Rodriguez-Fletcher or Batt in family therapy.

Timm testified that Jamee must first attend parent-only sessions and would then be incorporated into the children's therapy once the therapists determined that the children were ready. Jamee refused to do family therapy with Rodriguez-Fletcher and has told Timm that she does not trust Rodriguez-Fletcher. At trial, Jamee testified that the perception Rodriguez-Fletcher "has of me is completely inaccurate, and I don't think that's fair going into a conversation with somebody who already has a preconceived notion of who you are."

Jamee was open to doing family therapy with Kate Batt, Kaizleigh's and Kopelyn's therapist who is supervised by Rodriguez-Fletcher. Emails between Jamee and Batt from the fall of 2024 demonstrate that Jamee reached out to Batt to set up an appointment for a parent-only session. In the email exchange, Batt offered Jamee a specific appointment time, which Jamee could not accommodate due to her work schedule, and Jamee requested a time on Fridays. Batt responded that she was only able to offer Jamee time for a parent-only session on Thursdays due to her limited availability. Jamee apparently thought that if she could not attend the parent-only session at the offered time in the email, she would be unable to work with Batt at another time.

Family therapy was brought up again during a family team meeting in January 2025. Rodriguez-Fletcher and Batt testified that Jamee was not interested in doing parent-only sessions with them and had found another family therapist. Dawson testified that family therapy would be beneficial for Jamee and the children, and that the provider should be someone who is "removed"

from the case. A new provider would allow for trust and effective therapy. Dawson acknowledged that she had never met the children and was not aware of their mental health diagnoses. Batt believed that it would be detrimental to start the children with a new provider as they had already seen a couple of therapists during the case. At trial, Jamee stated that she was willing to do family therapy, including working with either Rodriguez-Fletcher or Batt in order to reunify with her children.

Timm testified that throughout the case, Jamee has struggled to take feedback well. Timm stated that Jamee does not take accountability and would instead blame other people for causing chaos in the children's lives. According to Timm, Jamee has been hostile at nearly every one of the monthly family team meetings. Rodriguez-Fletcher testified that she has attended four or five of Jamee's family team meetings but there is very little discussion because Jamee becomes so dysregulated and escalated. Jamee will interrupt other people and will not give them an opportunity to speak. At the last family team meeting in January 2025, Jamee yelled and cursed at case professionals.

Jamee testified that she felt attacked during the family team meetings. Jamee stated that the facial expressions and visible annoyance by case professionals when she speaks makes her feel as though she is not wanted in the meetings. Jamee noted that she is making progress and participating in a variety of services. However, in the family team meetings, "there is always something that follows the great job with a negative response, and so it's very frustrating."

(c) Kasey's Case Plan Progress

Timm testified that Kasey's primary case plan goal was the same as Jamee's. However, Kasey did not take advantage of offered services, including mental health counseling or a parenting capacity evaluation. Kasey also did not complete the Circle of Security or Love and Logic parenting classes. Kasey did not complete a substance use evaluation though he did participate in drug testing, first through the Department and later through his probation. Some of the Department drug tests were positive, though Timm could not recall the number. Kasey has not had a positive drug test since he has been on probation. It is unclear from our record how long Kasey has been on probation.

Kasey was initially offered 10 hours of fully supervised visitation, though his hours decreased to 5 in June 2024 due to concerns of Kasey falling asleep during visitation, not engaging with the children, being unable to redirect the children, and ending visits early. However, Timm noted that Kasey's visitations had recently improved with Kasey learning how to better redirect the children and engaging the children in games, movies, and conversation about school or their activities. Visits take place at a visitation center or the children's placement, and Kasey sees the children informally one to three additional times a week at their placement. Kasey has also attended some of the children's extracurricular activities. Timm testified that generally, Kasey's attendance at visitation has been fairly consistent.

Aggie Vance, a family support worker, has supervised Kasey's visits since October 2024. According to Vance, Kasey has improved in redirecting and taking control of the children's behaviors to the point that Vance no longer needs to assist him. Kasey now sets boundaries and will follow through when the children have temper tantrums. Kasey has also taken the children into the community on visits, including to the pumpkin patch, the mall, the park, and restaurants.

Vance stated that when the children arrive at the visit, they are excited to see Kasey and at the end of the visit, they are ready to return to their placement.

Kasey met with Rodriguez-Fletcher on February 13, 2025, to begin involvement in the children's therapy. During family team meetings, Kasey is open to feedback. Kasey had been working at a car mechanic shop but was terminated in March 2025. He has been seeking employment since. At the time of trial, Kasey was living with a friend.

According to Timm, Kasey supports the children remaining in their current placement. Rodriguez-Fletcher testified that Kasey prefers the children stay with his parents but also felt that he could not relinquish his parental rights before Jamee's rights were terminated as he would then lose his relationship with the children.

(d) Children's Needs

Timm testified that all four children were doing well in school and at their current placement. Kenzington, Kaidynce, and Kaizleigh are participating in gymnastics and would be starting softball soon. Kopelyn would likely be starting tee-ball soon as well.

Rodriguez-Fletcher began seeing Kaidynce in January 2024 and Kenzington in August 2024. Rodriguez-Fletcher has also met Kaizleigh and Kopelyn, as she performed initial diagnostic interviews (IDIs) for all four children.

After Kaidynce's IDI in February 2024, Rodriguez-Fletcher diagnosed her with unspecified trauma and stressor-related disorder and concerns for child-parent relationship issues. Rodriguez-Fletcher ruled out PTSD and depressive or other mood disorder. Though Kaidynce had a previous diagnosis of early childhood bipolar disorder, Rodriguez-Fletcher did not feel Kaidynce presently had that disorder. During the interview, Kaidynce identified being exposed to traumatic events such as domestic violence and people getting hurt or threatened.

Kaidynce's unspecified trauma and stressor-related disorder greatly impacts her emotional and behavioral regulation. At times Kaidynce throws tantrums and is easily dysregulated. Kaidynce has done well with learning about emotions and trying to manage them. According to Rodriguez-Fletcher, since beginning therapy, Kaidynce was no longer having any behavioral issues at school and when she does have tantrums, they are both less frequent and intense.

Rodriguez-Fletcher testified that Kaidynce needs permanency and a caregiver who can help "coregulate" her. Because Kaidynce has not had a primary caregiver who could consistently meet her emotional and physical needs, she does not know how to get her needs met in a healthy way and instead seeks attention by throwing a tantrum or hitting others. Rodriguez-Fletcher believes that Kaidynce does not yet have a secure attachment to a caregiver, which places her at higher risk for mental health issues, legal issues, unhealthy relationships, and substance issues. Rodriguez-Fletcher performed a second IDI on Kaidynce in August 2024, which included the same diagnoses but also ruled out disruptive mood dysregulation disorder.

Rodriguez-Fletcher sees Kaidynce weekly and reported seeing positive progress. Kaidynce is now more organized and less chaotic in her play, and she allows Rodriguez-Fletcher to play directly with her. When Kaidynce first came to Rodriguez-Fletcher she was "dysphoric and stoic." At the time of trial, Kaidynce was happy and talkative, though she continues to have days where she is irritable or will have a flat affect.

During sessions, Kaidynce will talk with Rodriguez-Fletcher about the things she does on visits with Jamee and Kasey, but Kaidynce struggles to be fully open. Kaidynce reports to Rodriguez-Fletcher that if she tells Rodriguez-Fletcher things, Jamee will get upset. She has also told Rodriguez-Fletcher that Jamee does not like her. Rodriguez-Fletcher believes that there is more Kaidynce needs to process but that Kaidynce becomes avoidant because she does not want to do anything that will upset Jamee.

Rodriguez-Fletcher completed an IDI of Kenzington in August 2024. At that time, Kenzington was diagnosed with unspecified trauma and stressor-related disorder and concerns for parent-child relational issues. A PTSD diagnosis was ruled out. During her interview, Kenzington acknowledged domestic violence in the home, taking care of her siblings, Jamee being in various romantic relationships, and Kenzington feeling embarrassed of Jamee when they are out in public. Kenzington struggles with the tension of wanting to keep the peace and wanting to protect her siblings. Rodriguez-Fletcher sees Kenzington weekly and reported that like Kaidynce, Kenzington will say that she cannot tell Rodriguez-Fletcher something because it will make Jamee upset. Kenzington also stated that Jamee does not like Rodriguez-Fletcher and speaks poorly about her.

Rodriguez-Fletcher is concerned for Kenzington's attachment. Kenzington appears close to her grandparents, but Rodriguez-Fletcher has observed her to struggle with wanting to have people close to her but being unsure of who she is supposed to want. Kenzington does not want to make anyone mad, so she pushes people away. Kenzington has experienced significant chaos and chronic stress in her life. She has communicated that both Jamee and Kasey are important to her, but that she likes living in her current placement with her grandparents.

Rodriguez-Fletcher did IDIs for Kaizleigh and Kopelyn in August 2024. Both Kaizleigh and Kopelyn identified a significant amount of fighting in the home, and both were diagnosed with unspecified trauma and stressor-related disorder and concerns for parent-child relational issues.

Batt has seen Kaizleigh and Kopelyn for weekly therapy beginning in September 2024. Batt described Kaizleigh as quiet, withdrawn, and an internal processor. Kaizleigh's treatment goals include being able to manage her trauma and stress symptoms and learning coping skills to be able to manage her symptoms in the moment. In her sessions Kaizleigh will talk about enjoying cooking with Jamee. Kasey rarely comes up during Kaizleigh's sessions.

Batt is concerned about Kaizleigh's mood and that she is depressed and withdrawn most of the time. Batt is also concerned about Kaizleigh not having a safe person to bring her out of her "withdrawnness" and let her know that she is safe to express her feelings. Kaizleigh's play in session indicates wanting safety, protection, and to be taken care of. Batt noted that Kaizleigh's mood and not wanting to talk about her relationships is abnormal for a child of her age.

Kopelyn is more outgoing and is expressive of his anger. Batt noted that Kopelyn will have tantrums or become emotionally dysregulated before nearly every session. Batt has worked with Kopelyn on progressive muscle relaxation, guided imagery, and mindful breathing. In session, Kopelyn will discuss witnessing domestic violence between his parents or other people in the home. Kopelyn's coping mechanism in the home was to hide, and he will set up barriers between himself and Batt during sessions. Jamee and Kasey come up during sessions when Kopelyn and Batt are discussing emotions. Kopelyn would benefit from a caregiver who can let him know that it is safe to have emotions and teach him how to cope with his emotions in a safe way.

Rodriguez-Fletcher is concerned about attachment for all four children. Though interactions during visitations were positive, the children were still searching for a secure attachment. Rodriguez-Fletcher does not believe that either Jamee or Kasey has any insight into the children's trauma. Jamee has acknowledged that there was domestic violence in the home but does not fully grasp how that has affected the children or their relationship with her. During Rodriguez-Fletcher's meeting with Kasey, he was cooperative and open to talking about the needs of the children but struggled to take any accountability.

At trial, Jamee acknowledged that she played a part in the domestic violence dynamic. Jamee stated that she would never allow domestic violence in her household again. Jamee agreed that the children had been traumatized by the domestic violence in the home.

Rodriguez-Fletcher testified that if the parents would meet with the children's therapists, they could help the parents understand the children's experiences and feelings. Without the parents being able to understand the children, the children do not feel completely safe and secure, which can affect the relationship and attachment. Additionally, the children feel as though their experiences do not matter and they are supposed to "pretend like nothing has happened and be okay with that."

Timm described Jamee's case progress as "fair to good progress." Timm had lingering concerns regarding what Jamee would say to the children if unsupervised and Jamee's temper. Timm testified that the Department supported the termination of Jamee's parental rights because the children had been out of the home for over 21 months at the time of trial and needed a caregiver who could support their physical and emotional needs.

The juvenile court asked Timm why she thought that Jamee's parental rights should be terminated despite her positive case progress. Timm clarified that Jamee's biggest barrier to reunification was her inability to self-reflect, handle her own trauma, and "do things for the kids rather than herself." Timm stated that Jamee has made no progress toward being able to meet the children's emotional needs.

Timm testified that the Department likewise supported terminating Kasey's parental rights. Though Kasey is more engaged and willing to work with Timm for visitation and family team meetings than he was at the start of the case, Timm described Kasey's case progress as "minimal."

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on April 23, 2025, terminating Jamee's rights to Kenzington, Kaidynce, Kaizleigh, and Kopelyn and Kasey's rights to Kenzington, Kaizleigh, and Kopelyn. The court found that the State had met its burden of proving that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292 (7). Following a lengthy analysis, the court concluded that both Jamee and Kasey were unfit parents and that it was in the best interests of the children to have their parental rights terminated.

Jamee appeals and Kasey cross appeals.

### III. ASSIGNMENTS OF ERROR

Jamee assigns, restated, that the juvenile court erred in finding that it was in the best interests of the children to terminate her parental rights to Kenzington, Kaidynce, Kaizleigh, and Kopelyn.

Kasey cross-appeals, assigning, restated, that the juvenile court erred in finding that statutory grounds existed to support the termination of his parental rights, and in in finding that it was in the best interests of the children to terminate his parental rights to Kenzington, Kaizleigh, and Kopelyn.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

### V. ANALYSIS

#### 1. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292 (7). Kasey assigns that the juvenile court's finding that § 43-292(7) was proven was in error, because "even though the children were placed outside of the home for said amount of time, such a fact does not automatically demonstrate his parental unfitness." Brief for appellee and cross-appellant at 12. We will address Kasey's fitness in our discussion of the children's best interests below.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Jamee's home on May 26, 2023. The State filed the motions for termination of parental rights on October 24, 2024. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). The children have remained out of the home since their removal in May 2023. At the time of filing, the children had been in out-of-home placement for nearly 17 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

Kasey also assigns that statutory grounds did not exist under § 43-292(2), (4), and (6) to support termination of her parental rights. However, although the State alleged these other bases for termination of the parties' parental rights, the juvenile court only found the existence of the statutory element under § 43-292(7). And, if an appellate court determines that the lower court

correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Jamee's and Kasey's parental rights exists.

## 2. BEST INTERESTS AND UNFITNESS

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

We acknowledge that Jamee's ability to be fully involved in the juvenile case was delayed due to her living in Denver with Kopelyn while he received treatment for his leukemia. While Jamee was out of the state, she stayed connected to her other children through video visits. Upon Jamee's return to Nebraska, she completed each evaluation requested of her and followed through with the recommendations. Jamee participated in individual therapy with Dawson weekly for almost a year at the time of trial. Dawson testified that Jamee was properly invested in the therapeutic process, had taken responsibility for her role in her children's current situation, and was making an effort to improve. However, Dawson did not have complete information about Jamee's domestic violence history or the emotional status and needs of the children. Dawson did not opine regarding Jamee's ability to parent and maintain a healthy bond with her children.

Jamee has maintained her sobriety since December 2023. Jamee has been employed since she returned to Nebraska in October 2023 and secured her own apartment in June 2024. All case professionals who visited Jamee's apartment described it as a clean and inviting home. Jamee has also demonstrated progress in her ability to parent. Though initially her visits were chaotic, with Jamee raising her voice at the children and the children acting out, once Jamee's visitations moved to her apartment, she was able to develop a routine which included chores, meal preparation, eating at the table, organized activities for the children, and getting them ready for bed. Jamee also

attended her children's extracurricular activities. The visitation workers noted Jamee leveraging skills she learned in her individual therapy and parenting class curriculum to stay calm and impose boundaries for her children. Visitation workers and Jamee's sister noted an affectionate relationship between Jamee and the children.

However, the significant domestic violence that the children experienced in Jamee's home and her inability to address the impact on the children has, as noted by the juvenile court, "produced children that are confused, scared, anxious, and struggling with attachment." The children struggle to trust others and have not been able to fully disclose their thoughts and emotions in their therapy sessions for fear of angering Jamee. At the time of trial, the children were still suffering from the trauma they had been exposed to and the lack of a stable adult in their life. According to Rodriguez-Fletcher, the only way for the children's mental health to improve is to have at least one adult in their lives that they can create a healthy attachment with. Before this can happen, there must be therapy that includes the children and the adult. During the pendency of the juvenile case, Jamee has not participated in even the initial phases of family therapy. Jamee has not shown that she is able to meet the children's emotional needs.

Jamee has been less than cooperative with various case professionals, particularly Rodriguez-Fletcher, and has been disruptive during various team meetings. Because of Jamee's behavior and the resulting lack of family therapy, she has been unable to progress beyond supervised visitation with her children and is not in a position to have the children returned to her care.

Kasey has been consistent in his drug testing and has maintained sobriety since he began his probation. Vance testified that Kasey's ability to parent has improved throughout the case. Kasey sets appropriate boundaries with the children and is interested in their lives. He is permitted informal visits at the children's placement and community outings with the children. Kasey has met with Rodriguez-Fletcher about becoming involved in the children's therapy and is open to discussing the needs of the children.

However, Kasey did not complete any of his court-ordered evaluations or any parenting classes. Though he sees the children informally, his supervised visitation occurs for only 5 hours a week. Kasey has not progressed to having additional visitation hours or any unsupervised time with his children. As noted by the juvenile court, "Incapable of taking care of his own needs, [Kasey] has shown no ability to take care of his children." Kasey has failed to complete even the basic elements of his case plan. Further, Kasey has indicated his belief that placement with his mother and stepfather is appropriate for the children.

Based on the evidence presented, there has been minimal change in Jamee's and Kasey's ability to meet their children's emotional and psychological needs. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). The children have been in foster care since May 2023. Rodriguez-Fletcher testified to their increased need for permanency due to their trauma history and diagnoses. The children deserve stability and should not linger in foster care

while Jamee and Kasey are unable to rehabilitate themselves. Accordingly, we find there was clear and convincing evidence to show that Jamee and Kasey were unfit and that terminating their parental rights was in the children's best interests.

## VI. CONCLUSION

Upon our de novo review of the record, we conclude grounds for termination of Jamee's parental rights to Kenzington, Kaidynce, Kaizleigh, and Kopelyn, and Kasey's parental rights to Kenzington, Kaizleigh, and Kopelyn, were proved by clear and convincing evidence under § 43-292(7). The State also proved that the termination of Jamee's and Kasey's parental rights is in the children's best interests. Accordingly, the juvenile court's orders are affirmed.

AFFIRMED.